EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

Washington Field Office

1801 L Street, N.W., Suite 100

Washington, D.C. 20507-1002

EEOC WASHINGTON FIELD OFFICE
2006 JUN 21 P 1:24
1801 L ST. NW WASHINGTON DC 20507

- - - - - - - - - - - - - - -x

IONA CALHOUN, :

Complainant, :

v. : EEOC No.

U.S. GENERAL SERVICES : 100-2004-00691X

ADMINISTRATION, :

Agency. :

- - - - - - - - - - - - - - -x

Tuesday, June 6, 2006

Washington, D.C.

The above-entitled matter came on for hearing at the U.S. General Services Administration, 1800 F Street, N.W., Room 4115, Washington, D.C., 20405, commencing at 9:50 a.m., before Kurt C. Hodges, Administrative Judge.

GOVERNMENT EXHIBIT 1

Page 6

THE ADMINISTRATIVE JUDGE: It is approximately 9:50 a.m. on June 6th in the year 2006. We have convened in the matter of Ms. Calhoun versus the United States General Services Admissions, hereafter referred to as. EEOC case number 100-2004-00691X. Let me first start by saying that I'm recovering from a cold, so my voice is not what it normally is. I'll do my best.

Present in the room this morning is the complainant, Ms. Calhoun, complainant's representative, Mr. Taragin, complainant's co-counsel, Mr. Snider, Agency counsel Mr. Phaup, an associate of Snider and Associates, Ms. Cohen -- is that correct? Okay. The Court Reporter, Ms. Edwards, and myself, Administrative Judge Hodges.

The Court Reporter is instructed to send the completed transcript, along with two copies, to my office and not to the parties. I will then issue copies of the transcript to the parties when I issue my formal decision.

Page 7

PROCEEDINGS

My name is Administrative Judge Hodges. I've been assigned by the EEOC to adjudicate this complaint. The counsels are instructed to direct any objections to me, not to the opposing party. Any interruptions or irrelevant testimony will not be permitted. The issue pending adjudication this morning is, one, concerning the non-selection. I'm going to actually read the issue into the record.

The issue pending adjudication is whether complainant was subjected to discrimination based on her race, African-American, sex, female, and/or in retaliation when she was not selected for a computer specialist GS334-14 position that was advertised under vacancy announcement number 01004103.

Mr. Taragin, do you concur that is the issue pending adjudication?

MR. TARAGIN: Yes. We'd just like

Page 8

to withdraw the sex portion of that and just keep it as a discriminate against on the basis of her race and in retaliation for prior EEO activity.

THE ADMINISTRATIVE JUDGE: Okay. Mr. Phaup, do you concur that is the issue?

MR. PHAUP: We concur. Thank you, your Honor.

THE ADMINISTRATIVE JUDGE: Okay. We have several witnesses that have been approved to testify this morning on behalf of the complainant. We have Ms. Calhoun the agency we have Ms. Bradfield and we also have a Ms. Lewis, who was approved, but is not able to testify due to -- is it retirement?

MR. TARAGIN: Not entirely.

THE ADMINISTRATIVE JUDGE: Cessation of employment?

MR. TARAGIN: Yes.

THE ADMINISTRATIVE JUDGE: Okay. herself, Ms. Peterson-Parker. On behalf of

Page 9

Prior to the hearing, I received a motion in limine submitted by the complainant moving for the exclusion of testimony of Ms. Tokey Bradfield. I did not receive a copy of the agency's opposition, which could be due to administrative error; however, I was provided a copy this morning and have conducted a cursory review. My understanding is that complainant's primary argument is that Ms. Bradfield was not identified in connection to some earlier discovery requests that was submitted earlier in this case.

My understanding, also, is that Ms. Bradfield is actually the selectee. Ms. Bradfield was identified within the investigation as a selectee and I believe at least one or more of the agency officials offered specific explanations regarding the reasons for her selection. Therefore, I have determined that it is not appropriate to exclude Ms. Bradfield, that the agency was on herself, Ms. Peterson-Parker. On behalf of

this as Plaintiff's Exhibit No. A, which is the national agreement.

THE ADMINISTRATIVE JUDGE: Okay. Let's mark the document as C-1, please?

(The document referred to was marked for identification as Complainant's Exhibit No. 1.)

BY MR. TARAGIN:

Q Can you identify that document, Ms. Calhoun?

A Yes.

Q And what is that?

A This is the national agreement between the General Services Administration and the National Federation of Federal Employees.

Q Can you point me to the section where it's stating that it has to be open for 10 days?

A Article 14, Merit Staffing. And it's on page 32.

Q And what was their GS levels? For

Q What does it say specifically?

A Do you want me to read the whole thing or just that section?

Q The document will speak for itself. It's your testimony that the document states what?

A It states that it should be open -- the job should be open for 10 working days, I believe. I haven't looked at this in a while. Let me see. Oh, here it is. Okay. Section five, Vacancy Announcement, Posting Vacancy Announcement, part C.

Q Okay.

A The employer agrees to post vacancy announcement on official bulletin boards or make announcements available in other established areas, in the area of consideration, for not less than 10 working days.

Q Okay. Thanks. I'm just going to submit it. And was this the national agreement that was in place in 2000 during

when the selection was occurring?

A Yes.

MR. TARAGIN: I submit Exhibit No. 1 into evidence.

THE ADMINISTRATIVE JUDGE: Mr. Phaup?

MR. PHAUP: No objection.

THE ADMINISTRATIVE JUDGE: Okay. C-1 is received via stipulation.

(The document referred to was received into evidence as Complainant Exhibit No. 1.)

THE ADMINISTRATIVE JUDGE: Mr. Taragin?

BY MR. TARAGIN:

Q Okay. When did you apply for that position? And we're going back now to the position that's the subject of this complaint, the computer specialist, GS334-14 position.

A Actually, I think it went in the day – the last day, the 21st. December 21, agreement that was in place in 2000 during

2000.

Q And how did you learn about that vacant position being available?

A I found the announcement on my chair.

Q Do you know who put –

A No. I never did find out.

Q Can you explain the application process? What did you do? What was involved in the application?

MR. PHAUP: I'll object to the vagueness and compound nature of the question.

THE ADMINISTRATIVE JUDGE: Do you want to rephrase it?

MR. TARAGIN: Yes.

BY MR. TARAGIN:

Q What steps did you take to apply for the position?

A Normally you read the announcement and if you qualify in rank and factors, you respond to them. And you send in your agreement that was in place in 2000 during

Page 110

MR. PHAUP: No further questions.
THE ADMINISTRATIVE JUDGE: Okay. Do you have any follow-up?
MR. TARAGIN: No, your honor.
THE ADMINISTRATIVE JUDGE: All right. Ms. Calhoun, it appears you've completed your testimony. I'd like to thank you very much for testifying. You may be called to testify in rebuttal, so please do not talk to anyone other than counsel about these questions or the complaints. If the order is not followed, a sanction would be imposed, up to and including a judgement entered in favor of the agency or dismissal of the complaint -- or a judgement entered in favor of the follow the same rules. Do you understand?
THE WITNESS: Yes.
THE ADMINISTRATIVE JUDGE: All right. You may return to your original seat. Let's go off the record, please?
(Off the record.)
complainant if a agency witness does not

Page 111

THE ADMINISTRATIVE JUDGE: We're back on the record after completing the testimony of Ms. Calhoun. We have a housekeeping matter to address with respect to the agency's exhibits. Mr. Phaup?
MR. PHAUP: I'd like to move agency exhibits one, two and three into evidence.
THE ADMINISTRATIVE JUDGE: Okay. Exhibit A-1 has been received previously via stipulation. Mr. Taragin, any objection to the admission of exhibit A-2 or A-3?
MR. TARAGIN: No, your Honor.
THE ADMINISTRATIVE JUDGE: All right. A-2 and A --
MR. TARAGIN: Other than relevance which we discussed before.
THE ADMINISTRATIVE JUDGE: Okay. The relevance objection is noted. A-2 and A-3 is received via stipulation.
(The documents referred to were received into evidence as Agency
complainant if a agency witness does not

Page 112

Exhibits No. 1 and 2.)
THE ADMINISTRATIVE JUDGE: Okay. Let me rephrase. Exhibits A-2 and A-3 are received subject to the complainant's objection. All right. Let's go off the record.
(Off the record.)
THE ADMINISTRATIVE JUDGE: We're ready to begin the testimony of Ms. Peterson-Parker. Could you spell your last name for the record?
THE WITNESS: P-E-T-E-R-S-O-N, hyphen, P-A-R-K-E-R.
THE ADMINISTRATIVE JUDGE: And would you raise your right hand, please?
(Witness sworn.)
THE ADMINISTRATIVE JUDGE: You've been called to testify on behalf of the complainant. Mr. Taragin, who's complainant's counsel, is going to ask you a series of questions. Please let him finish complainant if a agency witness does not

Page 113

the question before you answer. Mr. Phaup, who is the agency counsel, if he objects to a question, do not answer it until I have issued a ruling on the objection. I will then signal to you if I'd like you to respond; okay? Please keep your voice raised so the Court Reporter can hear everything one at a time. Mr. Taragin?
TESTIMONY OF WANDA PETERSON-PARKER
WITNESS
DIRECT EXAMINATION
BY MR. TARAGIN:
Q Good afternoon, Ms. Peterson-Parker. What is your current position?
A Program analyst.
Q And what is your GS level?
A GS-15.
Q And how long have you been in this position?
A Seventeen months.
Q Are you a supervisor?
that you are saying and please try to speak

Page 114

A I do not sign performance appraisals, thus I'll say I'm not a supervisor.

Q Prior to this, the position you were in about 17 months, you said, what was your prior position?

A I was a program analyst grade 14, same GSA organization, but in a different division.

Q How long were you in that position for?

A I'll say four years. Three to four years.

Q Did you supervise anybody in that position?

A I was in a team leader position, as I am with my current position. Though I recommend and facilitate and advise same-grade associates and lower-level associates, I do not sign anyone's performance appraisal and thus for that reason I'll say I'm not a supervisor.

that you are saying and please try to speak

Page 115

Q What was your position in or about December of 2000?

A I was in the Office of Government-wide Policy, Office of Information Technology, grade 14, deputy director.

Q What does that mean when you say deputy director?

A My direct report -- I reported to a director and I was his first in command. In his or her absence, I would serve in their absence and make decisions in their absence, supervise in their absence.

Q Were you a supervisor? Did you supervise any employees?

A Again, OGP use what we call a virtual position. We perform certain duties, but they were not on paper. I did supervise as far as tasking the staff to do some things, but I was not their supervisor of record in that I did not sign performance appraisal

Q Do you hand out work assignments?

regarding their performance.

Page 116

A I did for my task. I did hand out work assignments, yes.

Q Did you have input into what their performance appraisals looked like?

A I did, yes.

Q And how long were you in that position for? When did you begin that position?

A The 14 position as a whole I started under Cynthia Warner and I'll say I was as a 14 in the Office of Information Technology four or five years.

Q Okay. Do you recall when that may have began when you started that position? If you can recall.

A I failed to bring my resume with me or I would have the exact dates. I worked with Cynthia Warner during the late 1990s and I think I started with Paul Woodson during 2000 or late 1999 as a result of Cynthia Warner retiring.

regarding their performance.

Page 117

Q Mr. Woodson would have been your first-line supervisor?

A Correct.

Q And who was your second-line supervisor?

A Tom Horan.

Q Do you have a computer background?

A I do.

Q Can you please state what that background is specifically? What computer skills --

A I have used the Microsoft Suite of Office products for I'll say not quite 10 years -- whenever they became available on the market, I've been using them. I used them for writing, word documents, PowerPoint presentations, publishing marketing materials, using the internet for e-mail, doing research, so on and so forth.

Q How many employees worked under you in 2000 when you were the deputy director?

regarding their performance.

Page 130

Ms. Calhoun about that issue?
A I guess you would say that it was a joint complaint, because we were at the same EEO meeting. Yes.
Q Were there other people at that EEO meeting besides the two of you?
A No. No one else. We had spoken to our other counterparts and -- I won't put words in their mouths, but they did not want to go through the process I'll say.
Q So did you attempt to file that as a class-action complaint?
A By class-action you mean?
Q More than one or two people together filing as a group?
A Well, yes, but I would say that was done informally by speaking with our co-workers, asking how they felt about it. But as it ended up, it was only Iona and myself.
Q Did your relationship, based on that complaint, affect your objectiveness when because of her. But she has since retired.

Page 131

reviewing her work or Ms. Bradfield's work?
A No. Because by that time, that vacancy announcement came. I had been promoted from a 12 to a 13 as a result of the EEO complaint. And having had the opportunity to report to decent people, I was promoted to a 14. So I was somewhat distanced from the complaint itself, but I was still in the position to maintain my objectivity, having worked in the organization for a number of years and knowing how things were managed.
Q Did your friendship with Ms. Calhoun affect your objectivity when reviewing her
A At that time, no.
Q Was it ever a factor?
A No. Because I thought -- and I still do -- I think highly of Ms. Calhoun and Ms. Bradfield. But for a management perspective, you look at the facts, skills and abilities when you hire someone. And so based on that work or Ms. Bradfield's work?

Page 132

information, I have the position I have. And I don't think that, no, my EEO activity had a bearing on that selection.
Q Okay. I want to focus now on the actual selection at issue in today's case and that is a -- the issue is that Ms. Calhoun alleges that she was discriminated against on the basis of her race and retaliation for not being selected for a computer specialist GS-14 position advertised under vacancy announcement number 01004103. When did you first learn that the vacancy existed?
A I think someone may have told me about it and I was surprised, because as Mr. Woodson's deputy, he didn't mention it to me. I mentioned it to him.
Q Okay. Was that vacancy announcement posted anywhere or made public for all the employees?
A At that time they were posted downstairs on the first floor. work or Ms. Bradfield's work?

Page 133

Q Do you know if this was posted down there? Did you ever see it?
A I would have to say, yes, I saw it.
Q Okay.
A But not because Paul -- Mr. Woodson mentioned it to me.
Q Well, did he generally mention vacancies to you?
A That was the first we had had.
Q What was your working relationship with Mr. Woodson? Was it professional?
A It was professional. I had a professional working relationship with Mr. Woodson.
Q Can you describe Mr. Woodson's relationship with Ms. Bradfield?
A Well, Mr. Woodson and Ms. Bradfield had worked together for a number of years, as I had indicated, in what we refer to the front office, the administrative office. And I'm not sure if Paul worked with Ms. work or Ms. Bradfield's work?

Page 134

Bradfield when she reported to Dale Christianson or not. But she had worked with him for a number of years.
Q Did you ever have a meeting with Mr. Woodson about the vacancy announcement?
A I did.
A The meeting was a couple of days before the vacancy had closed. And we were about to go up to our holiday party in the front office area and he asked that I step into his office. And he said I'm going to be on vacation, and there's a vacancy posted, and I think that Tokey is the best qualified person for the job.
Q Do you known if he had seen any applications at that point?
A Well, he shouldn't have because the vacancy had not yet closed.
Q I'm sorry, how would he know that Ms. Bradfield was the best qualified for the position?
Q And when was that meeting?

Page 135

A I can't answer that.
Q What was your response to that statement by Mr. Woodson?
A I can visualize myself sitting in his office with the door closed, face-to-face, and I was shocked, because it was not a vacancy that I did the paperwork for. I hadn't created it and he was basically asking me -- that was my interpretation of what he had said. I will be on vacation, the vacancy will be closing and I think that Tokey is the best qualified person for the job.
Q Did he follow --
A It was like a heavy weight had been placed on me. That's how I felt.
Q Do you feel that Ms. Bradfield was pre-selected for the position by Mr. Woodson?
A I think she was, otherwise he wouldn't have made that statement to me.
Q Did you go and ask Mr. Woodson, or mention to him, that you felt that was
Q And when was that meeting?

Page 136

unfair?
A Based on the timing -- it was the holiday season. As I indicated, we were about to go to the front office for a holiday party and I believe that right after that he went on holiday vacation.
Q Did you ever express to anybody that you thought that his pre-selection was unfair?
A I did not.
Q Why didn't you?
A I was serving as his deputy and I felt that in order to show that I could manage, that I could follow directions, that I would follow his direction. It wasn't like there was anyone else in the organization that I could really speak with about it.
Q Did you feel that you may have been retaliated against had you complained? been in the past.
Q What do you mean that you've been in
A It's very possible, because I have

Page 137

the past?
A Well, for example, when I filed my EEO complaint -- when I expressed that I was not being compensated as far as the same grade level as my other associates on the team, I was blackballed. And evidence of that is my performance rating subsequent to having been told that.
Q Did you fear that would occur again if you complained about it?
A It was possible, because all of the managers were still -- the senior managers were still in place at that time.
Q And was that the reason you did not go with the --
A That was the reason. And, you know, also, there's this team -- management team concept and I wanted to show that I could perform a certain function in the role of deputy director.
Q Did you take Mr. Woodson's statement
A It's very possible, because I have

Page 138

as a suggestion or an order?
A I took it -- he looked at me -- we sat across from each other and he looked at me and he said I think that Tokey is the best qualified for the position.
Q Why did you take that as an order as opposed to a suggestion to you?
A I'll give you an example. It's something that we refer to as emotional intelligence. You're able to feel a person out after having worked with them for a while. And sometimes you don't have to work with them for a while. But I had worked with Paul long enough to know what he meant.
Q And what did you take his direction to mean?
A He said that -- it implied to me that he wanted me to select Tokey for the job.
Q Okay. After Mr. Woodson made that statement to you, did you ever meet with Ms. Patricia Lewis?
A It's very possible, because I have
going to say a couple of hours before the

Page 139

A I never met with her.
Q Did you ever come in contact with her?
A She provided the referral list of names.
Q Can you describe how that occurred, beginning with when she provided that to you?
A Paul told me -- Mr. Woodson told me when the vacancy would close, so in anticipation of that date, I waited for a call from Ms. Lewis. She phoned me -- I'm close of office -- to say that she had a vacancy on the referral list. I said, well, wait a minute. Doesn't someone have until the close of business to submit any paperwork? You know, you don't know if they're mailing it or whatever. So she said yes. And so I said will you be here tomorrow? She said yes. I said, well, I'll accept it then.
Q Did she at any time -- are you aware
going to say a couple of hours before the

Page 140

of her ever making her own recommendation as to who was best qualified to Mr. Woodson?
A No. But because she called me early like she did, it just -- to me it was a further indication that the job was for Tokey.
Q Can you explain why you felt -- what actions led you to believe that?
A Granted it could have been a holiday and she wanted to -- I don't know, I can't speak for her. I don't know what her rationale was. All I know is that she called me -- she phoned me before the close of business to say that she had an application or a referral list for the job. And I'll refer to it as the registry. I don't know the terms they use. The opportunity for submission of an application had not closed and she was ready to bring me the documentation or the applicants that had been submitted today.
going to say a couple of hours before the

Page 141

Q Did she ever make a recommendation to you that she would be the best qualified?
A She did not.
Q Would she have been in a position to make such a determination based on her position description?
A If she's a personnel specialist -- and I don't have that background to know what she does. Based on whatever criteria she looks at, I would think that she would.
Q Did she ever make that recommendation to anybody that you're aware of?
A Not to my knowledge, no.
Q I want to look at the actual position description that we've been talking about and that is located in report of investigation at tab 10. I have -- yes, 10-B. I have a copy of that --
MR. TARAGIN: Mr. Phaup, do you have an extra copy of the --
MR. PHAUP: I do.
going to say a couple of hours before the

Page 142

MR. TARAGIN: Could I have a look at that?
MR. PHAUP: You may.
MR. PHAUP: You're welcome.
BY MR. TARAGIN:
Q Do you see 10-A, the vacancy announcement?
A Okay.
Q And that's for the position of a computer specialist, Office of Government-wide Policy Office of Information Technology. Do you see that?
A Yes.
Q Okay. And then if you look at 10-B, two pages later, that is the Peevey Library. Do you see where I'm referring to?
A Yes.
Q And both of these documents discuss the qualifications and quality ranking factors for the position.
A Okay.
MR. TARAGIN: Thank you.

Page 143

Q Did you review the applications of both Ms. Bradfield and -- well, strike that. When you received the referral list from Ms. Lewis, whose names were on the referral list?
A Tokey Bradfield's, Tisha Boddie's and Iona Calhoun's.
Q Can you just state to me the races of Ms. Boddie, Ms. Bradfield and Ms. Calhoun?
A Both Ms. Calhoun and Ms. Boddie are African-American, Ms. Bradfield is Korean.
Q So when Ms. Lewis gave you the applications -- when she gave you the packet, did it contain the applications of those three employees?
A Yes.
Q Did it contain the applications of any other employees?
A No.
Q What I'd like to do is review the quality ranking factors with you for you to comment about the qualifications of both the
MR. TARAGIN: Thank you.

Page 144

complainant versus the qualifications of the selectee; okay?
A Okay.
Q If you look on the second page in tab 10, on top it says qualify ranking factors. The second page.
A Okay.
Q In the upper portion of the page, it's listed one through four. Do you see where I'm referring to?
A Yes.
Q Did you review this vacancy announcement? Did that come along with the application package?
A Yes.
Q Okay. And how long do you actually determination?
A I want to say at least a day.
Q So you reviewed in-depth the applications of all three of the people who had applied?
review the packet when making your

Page 145

A Yes.
Q Going through factor number one, it states that knowledge of internet and Federal Information Technology policies, principles and guidance. Can you state for me -- I just want to focus on complainant versus selectee. Ms. Boddie is -- you don't have to go through what her -- where she would have been. Can you comment, based on your personal knowledge and review of their applications, of the complainant's -- how she fit in? If she was well-qualified based on statement number one. Based on the knowledge of internet and Federal Information Technology policies, principles and guidance.
A Based on my observation of Ms. Calhoun and the fact that we had common projects from time to time and her responsibilities, I felt that she was very strong in this area. For example, as I mentioned, when we worked on the Information
review the packet when making your

Page 182

BY MR. PHAUP:
Q Yes. Not the investigator, a counselor.
A I don't recall having a conversation with an EEO counselor.
Q Would you look at the ROI that's in front of you, please? We're going to look at Exhibit No. 2.
AFTERNOON SESSION
A (Witness complies.)
Q And, actually, the first page, which oddly enough has the numeral two on it, titled EEO Counselor's Report at the top?
A Yes.
Q And if you would please look at page four at the bottom?
A (Witness complies.)
Q Actually, go back to page three to start. At the bottom of page three? This is the counselor's report. This is April 26, 2001. The EEO counselor interviewed Wanda Peterson-Parker, the selecting official of

Page 183

record. Does that refresh your recollection of whether you talked to an EEO counselor?
A To be honest with you, no. But if it's in here --
Q Okay. Then look at page four at the top for the page?
A Yes.
Q The last sentence at the top -- of
AFTERNOON SESSION
the first paragraph? Ms. Peterson-Parker did not feel the counselee's age, race, sex or prior EEO complaint activity had any bearing on the selection. Does that refresh your recollection whether you told that to the EEO counselor?
A It's here; however, to be honest with you, I don't recall the conversation for whatever reason.
heard Mr. Woodson make any disparaging racial comments about African-Americans?
A I have not.
Q Have you ever heard him make any

Page 184

comments derogatory to persons who were older?
A Older?
Q Older. Older than 40.
MR. TARAGIN: Objection as to relevance. I don't think age is not at issue in this case.
THE ADMINISTRATIVE JUDGE: Age is not
Q Okay. Thank you. Have you ever
a basis in the case. Sustained.
MR. PHAUP: Thank you. I thought it was.
BY MR. PHAUP:
Q Have you ever heard him make disparaging comments about females in the work place?
A I have not.
Q Did you ever hear Mr. Woodson make any disparaging comments about persons who had filed EEO claims?
A I have not.
Q Have you ever heard Mr. Woodson make

Page 185

any disparaging comments about Iona Calhoun for any reason?
A I have not.
Q You testified about your prior EEO actions in the late 80s and early 90s. In any of those prior EEO actions did you allege that Mr. Woodson was a discriminating official?
Q Okay. Thank you. Have you ever
A No.
Q You testified that a manager told you, you would be blackballed if you pursued your action related to the transfer; is that correct?
A Related to the transfer?
Q Wasn't your EEO action related to a transfer?
A Okay. You're going back to Susan Robinson-Tobin? Correct.
Q Yes. And so Mr. Woodson didn't have anything to do with your transfer, did he?
A Not to my knowledge.

Page 186

Q And Mr. Woodson never told you, you would be blackballed?
A He did not.
Q You testified that you have received, as part of your perception that you've been blackballed by GSA officials, that you had received unjustified performance ratings?
A Correct.
Q Okay. Thank you. Have you ever
Q Mr. Woodson did not give you any of he?
A He did not.
Q And, in fact -- well, let's start -- for the record, since we don't have any pictures or video, you're an African-American; is that correct?
A Correct.
Q And you are female?
A Correct.
Q And you, as you've testified, have had prior EEO activity?
A Correct.

Page 187

Q Has Mr. Woodson ever made any disparaging comments about you?
A Not to my --
MR. TARAGIN: Objection. Asked and answered.
MR. PHAUP: That was about Ms. Calhoun.
THE ADMINISTRATIVE JUDGE: Overruled. those unjustified performance ratings, did You may answer.
BY MR. PHAUP:
Q Has Mr. Woodson ever made any disparaging comments about you, Ms. Peterson-Parker?
A Not that I'm aware of.
Q And, in fact, for a period of time, Mr. Woodson was your supervisor, was he not?
A Correct.
Q And not only did he not give you bad performance evaluations, he gave you good performance evaluations, didn't he?
A He did, yes.

Page 188

Q In fact, I believe you testified in your deposition that his evaluations of your performance, he rated you as outstanding; isn't that correct?
A That's probably correct, yes.
Q And, in fact, Mr. Woodson was responsible for giving you performance awards, was he not? those unjustified performance ratings, did
A During the time I reported to him, yes.
Q As your supervisor he gave you performance awards?
A Yes.
Q And they included monetary awards, didn't they?
A Correct. Yes.
Q Thank you. You testified that Mr. Woodson wrote the vacancy announcement without consulting you; is that correct?
A Correct.
Q Is it fair to say that Mr. Woodson

Page 189

had a better idea of what he wanted out of
A I think that's fair, yes.
Q I want to focus on the events -- your testimony is that Mr. Woodson told you he thought Tokey was more qualified; is that correct?
A Correct.
Q And you interpreted that as Mr. filling that position than you did? Woodson instructing you to select Ms. Bradfield?
A Yes.
Q Is that correct?
A Yes.
Q And so is it your testimony here today that, in fact, Mr. Woodson made the selection and not you?
A Yes.
Q That it reflected his judgement, not yours?
A Yes.
Q AT the time he told you that, isn't

Page 190

it true that the vacancy was still open for applications; isn't that correct?

A Correct.

Q And at the time he told you that there -- I think you said there were two days left in the open period of the vacancy announcement; is that correct?

A I don't remember how many days were filling that position than you did? remaining; however, there was time remaining.

Q In fact, Mr. Woodson went on vacation prior to closing the announcement, didn't he?

A Yes.

Q At the time he told you that he believed Ms. Bradfield was the most qualified, you did not know who the other applicants were, did you?

A Correct.

Q You did not know whether or not Ms. Calhoun had applied, did you?

A Correct.

Q You did not know how many applicants

Page 191

there were, did you?

A Correct.

Q And you didn't know the race of the applicants, did you?

A Correct.

Q And you did not know the sex of the applicants, did you?

A Correct.

filling that position than you did?

Q And you did not know whether any of the other applicants had or had not prior EEO activity; isn't that correct?

A Correct.

Q And it's true, is it not, that at the time Mr. Woodson told you he thought Ms. who the other applicants were?

MR. TARAGIN: Objection. Calls for speculation.

THE ADMINISTRATIVE JUDGE: Want to tell us how she knows? How she would be aware?

BY MR. TARAGIN:

Page 192

Q Do you have any reason to know --

MR. TARAGIN: I believe on her direct testimony she said that -- the testimony was elicited by Mr. Taragin that he had not seen any of the other applications. And her answer was, how could he because the applications had not closed? I believe it's already in evidence.

Bradfield was more qualified, he did not know

THE ADMINISTRATIVE JUDGE: Okay. Overruled. You may answer.

BY MR. PHAUP:

Q Mr. Woodson didn't know who the other applicants were when he told you that he thought Tokey was the best qualified?

A Correct.

Q And he did not know the race of the other applicants at the time?

A Correct.

Q He did not know the sex of the other applicants at the time?

A Correct.

Page 193

Q And he did not know whether or not other applicants had prior EEO activity at the time he told you that Tokey was the best qualified; correct?

A Restate that, please?

Q That was a bad question. At the time he told you that he thought Tokey was more qualified, Mr. Woodson did not know whether Bradfield was more qualified, he did not know or not any of the other applicants had prior EEO activity?

A Correct.

Q And that's why you think Mr. Woodson pre-selected Ms. Bradfield, isn't it?

A I think Mr. Woodson pre-selected Ms. Bradfield because he generated the paperwork and he told me that she was the best qualified for the position.

Q Prior to knowing who else applied?

A Correct.

Q And he did not know -- at the time he told you that Ms. Bradfield was the most

Page 194

qualified, he did not know whether or not Ms. Calhoun had applied?

A Correct.

Q And as we now know, Ms. Calhoun, in fact, had not applied at the time he told you that? Do you know whether or not that's true?

A I do not know if that's true.

Q Mr. Woodson was on vacation when the announcement closed; correct?

A Correct.

Q Thank you. I want to talk -- Patricia Lewis is an African-American female, isn't she?

A She is, yes.

Q I want to talk for a second about the quality ranking factors about which you have testified. One through four that are in Exhibit No. 10, which you testified at some length about. If you want to look at them again, you can. We're talking about Exhibit No. 10, this is on page two.

Page 195

A (Witness complies.)

Q The announcement doesn't say what rank is to be given to any of the four factors, does it?

A I don't know if they usually do.

Q Okay.

A I would have to read it word-for-word. I don't know.

Q When you did your -- in the deposition and here today --

A Yes.

Q -- in the deposition and here today, did you assign equal rank to each of the four factors? Twenty-five percent, 25 percent, 25 percent, 25 percent?

A No. I took each ranking factors and they stood alone, basically, on their own merit or qualification and requirements, so to speak.

Q Were any of these factors more important to you than any other factors?

Page 196

A Again, I did not prepare the paperwork for this requirement.

Q Uh-huh.

A What I received was the listing and their resumes.

Q I'm actually talking about your testimony. The testimony where you gave a ranking of one through 10 in the deposition and your testimony here today where you gave a ranking of one through 100 for each of the factors. I'm talking about your testimony. When you did that ranking in your mind and you concluded that Ms. Calhoun was more qualified than Ms. Bradfield, did you assign equal weight to your scores on each of the four factors? In other words, is factor one just as important as factor four?

A When I was given the rank of zero to 100, that was based on the qualifications of the applicants.

Q Correct. And you went through the four facts and then you concluded that Ms.

Page 197

Calhoun was more qualified than Ms. Bradfield. And I'm asking you now, when you reach that ultimate conclusion, do you give equal weight to each of the four factors? Is factor four as important as one? Two just as important as three? Are they all equally weighted in your mind when you did your analysis?

A Personally, I would not say they were all equal.

Q Okay. Which ones are more important?

A I would say number one is important, number four is important, number three is important and number two is important in that order.

Q Okay. Do you know whether Mr. Woodson shared your ranking of the importance of the factors?

A Do I know what now?

Q Do you know whether or not Mr. Woodson shared the ranking of the importance

Page 214

Q Do you recall Mr. Phaup asking you a question regarding your perceptions of the selection due to your prior EEO history?
A Yes.
Q Sitting here today, so it's clear for the record, did your prior EEO activity have any affect on any testimony you gave today or on your decision to give any of the testimony the applicants to the position? you gave today?
A My previous or prior EEO background led me to make the decision as I was directed to by Paul Woodson.
Q Is your opinion about GSA management -- did that color your decision -- or was it colored by -- strike that. Was you opinion of GSA management colored by your prior EEO history?
A Based on where I was located at that time and the senior management within that organization at that time, it would have been colored by my EEO history because the same

Page 215

senior managers were there in the organization.
Q Were you able to be objective despite that?
MR. PHAUP: Objection to the that she was objective about.
THE ADMINISTRATIVE JUDGE: Sustained.
BY MR. TARAGIN:
vagueness. It's not clear what he's asking
Q Were you able to be objective during the selection process despite that?
A Well, when I made the selection, objectivity had nothing to do with it really. I did what I was told.
Q Is your testimony today affected by any of your -- colored by any of your prior EEO history?
A No.
Q In 2000, do you believe that there is an environment of discrimination within the agency?
A Off the top of my head I would say

Page 216

yes.
Q What's that based on?
A These things are intangible, not necessarily things you can see and feel. And I cannot give you -- going back to the year 2000, personally I was fine because I reported to a very fair person. But it's my understanding that, that wasn't the case vagueness. It's not clear what he's asking throughout the organization. And I cannot pinpoint any personal situations.
MR. TARAGIN: I have nothing further.
THE ADMINISTRATIVE JUDGE: Mr. Phaup, any new issues raised on redirect?
MR. PHAUP: Very quickly.
RE-CROSS-EXAMINATION
BY MR. PHAUP:
Q Testimony about how a selecting official could have obtained knowledge who applied, is there anything to prevent an applicant from simply telling Mr. Woodson that they applied?

Page 217

A Not to my knowledge.
Q You testified that going back to the year 2000, you reported to a very fair person. That very fair person was Mr. Woodson, wasn't it?
A No. I meant Cynthia Warner. May I?
Q I'd rather you didn't. Okay. Finally, about the vacancy announcement and vagueness. It's not clear what he's asking who could apply?
A Yes.
Q It was open to all GSA employees who otherwise met the criteria; isn't that correct?
A I don't know. I would have to look at the vacancy --
Q Let's look at the vacancy announcement. Exhibit No. 10. Where it says area of consideration at the very top.
Q See eligibles in the local committee area, status employees of the GSA in the Washington, D.C. commuting area?

Page 218

A Correct.
Q So it was not limited to Mr. Woodson's division and your division, was it?
A Correct.
MR. PHAUP: Okay. That's all.
THE ADMINISTRATIVE JUDGE: All right. It appears that you've concluded your testimony now. I'd like to thank you very
A Consideration -- yes.
much for coming and testifying. I'm ordering you not to speak to anyone, including the complainant, about these questions or any aspect of the complaint. Again, if the order's not followed, a sanction may be imposed, which may include a judgement entered in favor of one part or the other. Do you understand the seriousness of that order?
THE WITNESS: Yes.
THE ADMINISTRATIVE JUDGE: Thank you very much.
THE WITNESS: Is this going to be it?

Page 219

THE ADMINISTRATIVE JUDGE: Yes.
THE WITNESS: Meaning no one will call me --
THE ADMINISTRATIVE JUDGE: Let's go off the record.
(Off the record.)
THE ADMINISTRATIVE JUDGE: We've completed the testimony of Ms.
A Consideration -- yes.
Peterson-Parker. We still have the matter of the pending motion in limine. While off record Mr. Phaup indicated that he was not going to call Ms. Bradfield to testify, which would tend to make the motion mute at this point. Are there any other matters that need to be addressed on record before -- well, let me go back a step. Mr. Phaup, does the agency rest its case?
MR. PHAUP: Yes, your Honor.
THE ADMINISTRATIVE JUDGE: Then are there any other matters pertaining to either the hearing, or pending issues pre-hearing,

Page 220

that either of you feel need to be addressed before we move into the closing? Let's start with Mr. Taragin.
MR. TARAGIN: May I speak for a moment, your Honor.
THE ADMINISTRATIVE JUDGE: Off record?
MR. TARAGIN: No.
A Consideration -- yes.
THE ADMINISTRATIVE JUDGE: Certainly.
MR. SNIDER: Very briefly. The I'm sorry. Seven and eight and the statement of page nine, unlike the affidavits of Wanda Peterson-Parker at tab six and the plaintiff at tab five, are not initialed or signed on the first pages and each of them has a certification on the last page that, quote, I have signed or initialed each page. So we ask that they be stricken in their entirety because they are not certified as the person signed on the last page of each of these documents. I have read the statement, it is

Page 221

true and correct. I have signed or initialed each page. I've been given an opportunity to make any corrections or additions which have been initialed. Not tab seven, not tab eight, and certainly not the memo to file, which is followed up by a similar statement at tab nine. None of them have signatures or initialing on the first pages. We ask that affidavits at ROI tabs seven, eight, nine -- these be stricken from the ROI.
THE ADMINISTRATIVE JUDGE: Is there any -- do you have any reason to believe that the affidavits are not accurate?
MR. SNIDER: Yes. The person signs under the penalties of perjury that they have signed or initialed each prior page and these pages are not signed and initialed.
THE ADMINISTRATIVE JUDGE: I understand that, very clearly. But this is an ROI. As was pointed out at the beginning of the hearing this morning, this is a very old case, so there's been a lot of time to