**Capital Reporting Company**

Page 1

```
 1            EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
 2                     Washington Field Office
 3                 1801 L Street, N.W., Suite 100
 4                    Washington, D.C.  20507-1002
 5
 6   - - - - - - - - - - - -x
 7   IONA CALHOUN,                :
 8         Complainant,            :
 9      v.                         : EEOC No.
10   U.S. GENERAL SERVICES         : 100-2004-00691X
11   ADMINISTRATION,               :
12         Agency.                 :
13   - - - - - - - - - - - -x
14
15                              Tuesday, June 6, 2006
16                              Washington, D.C.
17
18   The above-entitled matter came on for hearing at
19   the U.S. General Services Administration, 1800 F
20   Street, N.W., Room 4115, Washington, D.C., 20405,
21   commencing at 9:50 a.m., before Kurt C. Hodges,
22   Administrative Judge.
```

(866) 448 - DEPO
www.CapitalReportingCompany.com

GOVERNMENT EXHIBIT 1

**Capital Reporting Company**

Page 6

1  THE ADMINISTRATIVE JUDGE: It is
2  approximately 9:50 a.m. on June 6th in the
3  year 2006. We have convened in the matter of
4  Ms. Calhoun versus the United States General
5  Services Admissions, hereafter referred to as
6  EEOC case number 100-2004-00691X. Let me
7  first start by saying that I'm recovering
8  from a cold, so my voice is not what it
9  normally is. I'll do my best.
10      Present in the room this morning is
11 the complainant, Ms. Calhoun, complainant's
12 representative, Mr. Taragin, complainant's
13 co-counsel, Mr. Snider, Agency counsel Mr.
14 Phaup, an associate of Snider and Associates,
15 Ms. Cohen -- is that correct? Okay. The
16 Court Reporter, Ms. Edwards, and myself,
17 Administrative Judge Hodges.
18      The Court Reporter is instructed to
19 send the completed transcript, along with two
20 copies, to my office and not to the parties.
21 I will then issue copies of the transcript to
22 the parties when I issue my formal decision.

Page 7

1       P R O C E E D I N G S
2  My name is Administrative Judge Hodges. I've
3  been assigned by the EEOC to adjudicate this
4  complaint. The counsels are instructed to
5  direct any objections to me, not to the
6  opposing party. Any interruptions or
7  irrelevant testimony will not be permitted.
8  The issue pending adjudication this morning
9  is, one, concerning the non-selection. I'm
10 going to actually read the issue into the
11 record.
12     The issue pending adjudication is
13 whether complainant was subjected to
14 discrimination based on her race, African-
15 American, sex, female, and/or in retaliation
16 when she was not selected for a computer
17 specialist GS334-14 position that was
18 advertised under vacancy announcement number
19 01004103.
20     Mr. Taragin, do you concur that is
21 the issue pending adjudication?
22     MR. TARAGIN: Yes. We'd just like

Page 8

1  to withdraw the sex portion of that and just
2  keep it as a discriminate against on the
3  basis of her race and in retaliation for
4  prior EEO activity.
5      THE ADMINISTRATIVE JUDGE: Okay. Mr.
6  Phaup, do you concur that is the issue?
7      MR. PHAUP: We concur. Thank you,
8  your Honor.
9      THE ADMINISTRATIVE JUDGE: Okay. We
10 have several witnesses that have been
11 approved to testify this morning on behalf of
12 the complainant. We have Ms. Calhoun
13 the agency we have Ms. Bradfield and we also
14 have a Ms. Lewis, who was approved, but is
15 not able to testify due to -- is it
16 retirement?
17     MR. TARAGIN: Not entirely.
18     THE ADMINISTRATIVE JUDGE: Cessation
19 of employment?
20     MR. TARAGIN: Yes.
21     THE ADMINISTRATIVE JUDGE: Okay.
22 herself, Ms. Peterson-Parker. On behalf of

Page 9

1  Prior to the hearing, I received a motion in
2  limine submitted by the complainant moving
3  for the exclusion of testimony of Ms. Tokey
4  Bradfield. I did not receive a copy of the
5  agency's opposition, which could be due to
6  administrative error; however, I was provided
7  a copy this morning and have conducted a
8  cursory review. My understanding is that
9  complainant's primary argument is that Ms.
10 Bradfield was not identified in connection to
11 some earlier discovery requests that was
12 submitted earlier in this case.
13     My understanding, also, is that Ms.
14 Bradfield is actually the selectee. Ms.
15 Bradfield was identified within the
16 investigation as a selectee and I believe at
17 least one or more of the agency officials
18 offered specific explanations regarding the
19 reasons for her selection. Therefore, I have
20 determined that it is not appropriate to
21 exclude Ms. Bradfield, that the agency was on
22 herself, Ms. Peterson-Parker. On behalf of

3 (Pages 6 to 9)

Capital Reporting Company

Page 38

1  this as Plaintiff's Exhibit No. A, which is
2  the national agreement.
3      THE ADMINISTRATIVE JUDGE: Okay.
4  Let's mark the document as C-1, please?
5      (The document referred to was
6      marked for identification as
7      Complainant's Exhibit No. 1.)
8  BY MR. TARAGIN:
9      Q  Can you identify that document, Ms.
10 Calhoun?
11     A  Yes.
12     Q  And what is that?
13     A  This is the national agreement
14 between the General Services Administration
15 and the National Federation of Federal
16 Employees.
17     Q  Can you point me to the section where
18 it's stating that it has to be open for 10
19 days?
20     A  Article 14, Merit Staffing. And it's
21 on page 32.
22     Q  And what was their GS levels? For

Page 39

1      Q  What does it say specifically?
2      A  Do you want me to read the whole
3  thing or just that section?
4      Q  The document will speak for itself.
5  It's your testimony that the document states
6  what?
7      A  It states that it should be open --
8  the job should be open for 10 working days, I
9  believe. I haven't looked at this in a
10 while. Let me see. Oh, here it is. Okay.
11 Section five, Vacancy Announcement, Posting
12 Vacancy Announcement, part C.
13     Q  Okay.
14     A  The employer agrees to post vacancy
15 announcement on official bulletin boards or
16 make announcements available in other
17 established areas, in the area of
18 consideration, for not less than 10 working
19 days.
20     Q  Okay. Thanks. I'm just going to
21 submit it. And was this the national
22 agreement that was in place in 2000 during

Page 40

1  when the selection was occurring?
2      A  Yes.
3      MR. TARAGIN: I submit Exhibit No. 1
4  into evidence.
5      THE ADMINISTRATIVE JUDGE: Mr. Phaup?
6      MR. PHAUP: No objection.
7      THE ADMINISTRATIVE JUDGE: Okay. C-1
8  is received via stipulation.
9      (The document referred to was
10     received into evidence as
11     Complainant Exhibit No. 1.)
12     THE ADMINISTRATIVE JUDGE: Mr.
13 Taragin?
14 BY MR. TARAGIN:
15     Q  Okay. When did you apply for that
16 position? And we're going back now to the
17 position that's the subject of this
18 complaint, the computer specialist, GS334-14
19 position.
20     A  Actually, I think it went in the day
21 -- the last day, the 21st. December 21,
22 agreement that was in place in 2000 during

Page 41

1  2000.
2      Q  And how did you learn about that
3  vacant position being available?
4      A  I found the announcement on my chair.
5      Q  Do you know who put --
6      A  No. I never did find out.
7      Q  Can you explain the application
8  process? What did you do? What was involved
9  in the application?
10     MR. PHAUP: I'll object to the
11 vagueness and compound nature of the
12 question.
13     THE ADMINISTRATIVE JUDGE: Do you
14 want to rephrase it?
15     MR. TARAGIN: Yes.
16 BY MR. TARAGIN:
17     Q  What steps did you take to apply for
18 the position?
19     A  Normally you read the announcement
20 and if you qualify in rank and factors, you
21 respond to them. And you send in your
22 agreement that was in place in 2000 during

(866) 448 - DEPO
www.CapitalReportingCompany.com

Capital Reporting Company

Page 110

1  MR. PHAUP: No further questions.
2  THE ADMINISTRATIVE JUDGE: Okay. Do
3  you have any follow-up?
4  MR. TARAGIN: No, your honor.
5  THE ADMINISTRATIVE JUDGE: All right.
6  Ms. Calhoun, it appears you've completed your
7  testimony. I'd like to thank you very much
8  for testifying. You may be called to testify
9  in rebuttal, so please do not talk to anyone
10  other than counsel about these questions or
11  the complaints. If the order is not
12  followed, a sanction would be imposed, up to
13  and including a judgement entered in favor of
14  the agency or dismissal of the complaint --
15  or a judgement entered in favor of the
16  follow the same rules. Do you understand?
17  THE WITNESS: Yes.
18  THE ADMINISTRATIVE JUDGE: All right.
19  You may return to your original seat. Let's
20  go off the record, please?
21  (Off the record.)
22  complainant if a agency witness does not

Page 111

1  THE ADMINISTRATIVE JUDGE: We're back
2  on the record after completing the testimony
3  of Ms. Calhoun. We have a housekeeping
4  matter to address with respect to the
5  agency's exhibits. Mr. Phaup?
6  MR. PHAUP: I'd like to move agency
7  exhibits one, two and three into evidence.
8  THE ADMINISTRATIVE JUDGE: Okay.
9  Exhibit A-1 has been received previously via
10  stipulation. Mr. Taragin, any objection to
11  the admission of exhibit A-2 or A-3?
12  MR. TARAGIN: No, your Honor.
13  THE ADMINISTRATIVE JUDGE: All right.
14  A-2 and A --
15  MR. TARAGIN: Other than relevance
16  which we discussed before.
17  THE ADMINISTRATIVE JUDGE: Okay. The
18  relevance objection is noted. A-2 and A-3 is
19  received via stipulation.
20  (The documents referred to were
21  received into evidence as Agency
22  complainant if a agency witness does not

Page 112

1  Exhibits No. 1 and 2.)
2  THE ADMINISTRATIVE JUDGE: Okay. Let
3  me rephrase. Exhibits A-2 and A-3 are
4  received subject to the complainant's
5  objection. All right. Let's go off the
6  record.
7  (Off the record.)
8  THE ADMINISTRATIVE JUDGE: We're
9  ready to begin the testimony of Ms.
10  Peterson-Parker. Could you spell your last
11  name for the record?
12  THE WITNESS: P-E-T-E-R-S-O-N,
13  hyphen, P-A-R-K-E-R.
14  THE ADMINISTRATIVE JUDGE: And would
15  you raise your right hand, please?
16  (Witness sworn.)
17  THE ADMINISTRATIVE JUDGE: You've
18  been called to testify on behalf of the
19  complainant. Mr. Taragin, who's
20  complainant's counsel, is going to ask you a
21  series of questions. Please let him finish
22  complainant if a agency witness does not

Page 113

1  the question before you answer. Mr. Phaup,
2  who is the agency counsel, if he objects to a
3  question, do not answer it until I have
4  issued a ruling on the objection. I will
5  then signal to you if I'd like you to
6  respond; okay? Please keep your voice raised
7  so the Court Reporter can hear everything
8  one at a time. Mr. Taragin?
9  TESTIMONY OF WANDA PETERSON-PARKER
10  WITNESS
11  DIRECT EXAMINATION
12  BY MR. TARAGIN:
13  Q  Good afternoon, Ms. Peterson-Parker.
14  What is your current position?
15  A  Program analyst.
16  Q  And what is your GS level?
17  A  GS-15.
18  Q  And how long have you been in this
19  position?
20  A  Seventeen months.
21  Q  Are you a supervisor?
22  that you are saying and please try to speak

29 (Pages 110 to 113)

(866) 448 - DEPO
www.CapitalReportingCompany.com

**Capital Reporting Company**

Page 114
1  A  I do not sign performance appraisals,
2  thus I'll say I'm not a supervisor.
3  Q  Prior to this, the position you were
4  in about 17 months, you said, what was your
5  prior position?
6  A  I was a program analyst grade 14,
7  same GSA organization, but in a different
8  division.
9  Q  How long were you in that position
10 for?
11  A  I'll say four years. Three to four
12 years.
13  Q  Did you supervise anybody in that
14 position?
15  A  I was in a team leader position, as I
16 am with my current position. Though I
17 recommend and facilitate and advise same-
18 grade associates and lower-level associates,
19 I do not sign anyone's performance appraisal
20 and thus for that reason I'll say I'm not a
21 supervisor.
22 that you are saying and please try to speak

Page 115
1  Q  What was your position in or about
2  December of 2000?
3  A  I was in the Office of Government-
4  wide Policy, Office of Information
5  Technology, grade 14, deputy director.
6  Q  What does that mean when you say
7  deputy director?
8  A  My direct report -- I reported to a
9  director and I was his first in command. In
10 his or her absence, I would serve in their
11 absence and make decisions in their absence,
12 supervise in their absence.
13  Q  Were you a supervisor? Did you
14 supervise any employees?
15  A  Again, OGP use what we call a virtual
16 position. We perform certain duties, but
17 they were not on paper. I did supervise as
18 far as tasking the staff to do some things,
19 but I was not their supervisor of record in
20 that I did not sign performance appraisal
21  Q  Do you hand out work assignments?
22 regarding their performance.

Page 116
1  A  I did for my task. I did hand out
2  work assignments, yes.
3  Q  Did you have input into what their
4  performance appraisals looked like?
5  A  I did, yes.
6  Q  And how long were you in that
7  position for? When did you begin that
8  position?
9  A  The 14 position as a whole I started
10 under Cynthia Warner and I'll say I was as a
11 14 in the Office of Information Technology
12 four or five years.
13  Q  Okay. Do you recall when that may
14 have began when you started that position?
15 If you can recall.
16  A  I failed to bring my resume with me
17 or I would have the exact dates. I worked
18 with Cynthia Warner during the late 1990s and
19 I think I started with Paul Woodson during
20 2000 or late 1999 as a result of Cynthia
21 Warner retiring.
22 regarding their performance.

Page 117
1  Q  Mr. Woodson would have been your
2  first-line supervisor?
3  A  Correct.
4  Q  And who was your second-line
5  supervisor?
6  A  Tom Horan.
7  Q  Do you have a computer background?
8  A  I do.
9  Q  Can you please state what that
10 background is specifically? What computer
11 skills --
12  A  I have used the Microsoft Suite of
13 Office products for I'll say not quite 10
14 years -- whenever they became available on
15 the market, I've been using them. I used
16 them for writing, word documents, PowerPoint
17 presentations, publishing marketing
18 materials, using the internet for e-mail,
19 doing research, so on and so forth.
20  Q  How many employees worked under you
21 in 2000 when you were the deputy director?
22 regarding their performance.

30 (Pages 114 to 117)

Page 130

1 Ms. Calhoun about that issue?
2   A   I guess you would say that it was a
3 joint complaint, because we were at the same
4 EEO meeting. Yes.
5   Q   Were there other people at that EEO
6 meeting besides the two of you?
7   A   No. No one else. We had spoken to
8 our other counterparts and -- I won't put
9 words in their mouths, but they did not want
10 to go through the process I'll say.
11   Q   So did you attempt to file that as a
12 class-action complaint?
13   A   By class-action you mean?
14   Q   More than one or two people together
15 filing as a group?
16   A   Well, yes, but I would say that was
17 done informally by speaking with our co-
18 workers, asking how they felt about it. But
19 as it ended up, it was only Iona and myself.
20   Q   Did your relationship, based on that
21 complaint, affect your objectiveness when
22 because of her. But she has since retired.

Page 131

1 reviewing her work or Ms. Bradfield's work?
2   A   No. Because by that time, that
3 vacancy announcement came. I had been
4 promoted from a 12 to a 13 as a result of the
5 EEO complaint. And having had the
6 opportunity to report to decent people, I was
7 promoted to a 14. So I was somewhat
8 distanced from the complaint itself, but I
9 was still in the position to maintain my
10 objectivity, having worked in the
11 organization for a number of years and
12 knowing how things were managed.
13   Q   Did your friendship with Ms. Calhoun
14 affect your objectivity when reviewing her
15   A   At that time, no.
16   Q   Was it ever a factor?
17   A   No. Because I thought -- and I still
18 do -- I think highly of Ms. Calhoun and Ms.
19 Bradfield. But for a management perspective,
20 you look at the facts, skills and abilities
21 when you hire someone. And so based on that
22 work or Ms. Bradfield's work?

Page 132

1 information, I have the position I have. And
2 I don't think that, no, my EEO activity had a
3 bearing on that selection.
4   Q   Okay. I want to focus now on the
5 actual selection at issue in today's case and
6 that is a -- the issue is that Ms. Calhoun
7 alleges that she was discriminated against on
8 the basis of her race and retaliation for not
9 being selected for a computer specialist GS-
10 14 position advertised under vacancy
11 announcement number 01004103. When did you
12 first learn that the vacancy existed?
13   A   I think someone may have told me
14 about it and I was surprised, because as Mr.
15 Woodson's deputy, he didn't mention it to me.
16 I mentioned it to him.
17   Q   Okay. Was that vacancy announcement
18 posted anywhere or made public for all the
19 employees?
20   A   At that time they were posted
21 downstairs on the first floor.
22 work or Ms. Bradfield's work?

Page 133

1   Q   Do you know if this was posted down
2 there? Did you ever see it?
3   A   I would have to say, yes, I saw it.
4   Q   Okay.
5   A   But not because Paul -- Mr. Woodson
6 mentioned it to me.
7   Q   Well, did he generally mention
8 vacancies to you?
9   A   That was the first we had had.
10   Q   What was your working relationship
11 with Mr. Woodson? Was it professional?
12   A   It was professional. I had a
13 professional working relationship with Mr.
14 Woodson.
15   Q   Can you describe Mr. Woodson's
16 relationship with Ms. Bradfield?
17   A   Well, Mr. Woodson and Ms. Bradfield
18 had worked together for a number of years, as
19 I had indicated, in what we refer to the
20 front office, the administrative office. And
21 I'm not sure if Paul worked with Ms.
22 work or Ms. Bradfield's work?

**Capital Reporting Company**

Page 134

1  Bradfield when she reported to Dale
2  Christianson or not. But she had worked with
3  him for a number of years.
4      Q   Did you ever have a meeting with Mr.
5  Woodson about the vacancy announcement?
6      A   I did.
7      A   The meeting was a couple of days
8  before the vacancy had closed. And we were
9  about to go up to our holiday party in the
10 front office area and he asked that I step
11 into his office. And he said I'm going to be
12 on vacation, and there's a vacancy posted,
13 and I think that Tokey is the best qualified
14 person for the job.
15     Q   Do you known if he had seen any
16 applications at that point?
17     A   Well, he shouldn't have because the
18 vacancy had not yet closed.
19     Q   I'm sorry, how would he know that Ms.
20 Bradfield was the best qualified for the
21 position?
22     Q   And when was that meeting?

Page 135

1      A   I can't answer that.
2      Q   What was your response to that
3  statement by Mr. Woodson?
4      A   I can visualize myself sitting in his
5  office with the door closed, face-to-face,
6  and I was shocked, because it was not a
7  vacancy that I did the paperwork for. I
8  hadn't created it and he was basically asking
9  me -- that was my interpretation of what he
10 had said. I will be on vacation, the vacancy
11 will be closing and I think that Tokey is the
12 best qualified person for the job.
13     Q   Did he follow --
14     A   It was like a heavy weight had been
15 placed on me. That's how I felt.
16     Q   Do you feel that Ms. Bradfield was
17 pre-selected for the position by Mr. Woodson?
18     A   I think she was, otherwise he
19 wouldn't have made that statement to me.
20     Q   Did you go and ask Mr. Woodson, or
21 mention to him, that you felt that was
22     Q   And when was that meeting?

Page 136

1  unfair?
2      A   Based on the timing -- it was the
3  holiday season. As I indicated, we were
4  about to go to the front office for a holiday
5  party and I believe that right after that he
6  went on holiday vacation.
7      Q   Did you ever express to anybody that
8  you thought that his pre-selection was
9  unfair?
10     A   I did not.
11     Q   Why didn't you?
12     A   I was serving as his deputy and I
13 felt that in order to show that I could
14 manage, that I could follow directions, that
15 I would follow his direction. It wasn't like
16 there was anyone else in the organization
17 that I could really speak with about it.
18     Q   Did you feel that you may have been
19 retaliated against had you complained?
20 been in the past.
21     Q   What do you mean that you've been in
22     A   It's very possible, because I have

Page 137

1  the past?
2      A   Well, for example, when I filed my
3  EEO complaint -- when I expressed that I was
4  not being compensated as far as the same
5  grade level as my other associates on the
6  team, I was blackballed. And evidence of
7  that is my performance rating subsequent to
8  having been told that.
9      Q   Did you fear that would occur again
10 if you complained about it?
11     A   It was possible, because all of the
12 managers were still -- the senior managers
13 were still in place at that time.
14     Q   And was that the reason you did not
15 go with the --
16     A   That was the reason. And, you know,
17 also, there's this team -- management team
18 concept and I wanted to show that I could
19 perform a certain function in the role of
20 deputy director.
21     Q   Did you take Mr. Woodson's statement
22     A   It's very possible, because I have

35 (Pages 134 to 137)

Capital Reporting Company

Page 138

1  as a suggestion or an order?
2      A   I took it -- he looked at me -- we
3  sat across from each other and he looked at
4  me and he said I think that Tokey is the best
5  qualified for the position.
6      Q   Why did you take that as an order as
7  opposed to a suggestion to you?
8      A   I'll give you an example. It's
9  something that we refer to as emotional
10 intelligence. You're able to feel a person
11 out after having worked with them for a
12 while. And sometimes you don't have to work
13 with them for a while. But I had worked with
14 Paul long enough to know what he meant.
15     Q   And what did you take his direction
16 to mean?
17     A   He said that -- it implied to me that
18 he wanted me to select Tokey for the job.
19     Q   Okay. After Mr. Woodson made that
20 statement to you, did you ever meet with Ms.
21 Patricia Lewis?
22     A   It's very possible, because I have

Page 139

1      A   I never met with her.
2      Q   Did you ever come in contact with
3  her?
4      A   She provided the referral list of
5  names.
6      Q   Can you describe how that occurred,
7  beginning with when she provided that to you?
8      A   Paul told me -- Mr. Woodson told me
9  when the vacancy would close, so in
10 anticipation of that date, I waited for a
11 call from Ms. Lewis. She phoned me -- I'm
12 close of office -- to say that she had a
13 vacancy on the referral list. I said, well,
14 wait a minute. Doesn't someone have until
15 the close of business to submit any
16 paperwork? You know, you don't know if
17 they're mailing it or whatever. So she said
18 yes. And so I said will you be here
19 tomorrow? She said yes. I said, well, I'll
20 accept it then.
21     Q   Did she at any time -- are you aware
22 going to say a couple of hours before the

Page 140

1  of her ever making her own recommendation as
2  to who was best qualified to Mr. Woodson?
3      A   No. But because she called me early
4  like she did, it just -- to me it was a
5  further indication that the job was for
6  Tokey.
7      Q   Can you explain why you felt -- what
8  actions led you to believe that?
9      A   Granted it could have been a holiday
10 and she wanted to -- I don't know, I can't
11 speak for her. I don't know what her
12 rationale was. All I know is that she called
13 me -- she phoned me before the close of
14 business to say that she had an application
15 or a referral list for the job. And I'll
16 refer to it as the registry. I don't know
17 the terms they use. The opportunity for
18 submission of an application had not closed
19 and she was ready to bring me the
20 documentation or the applicants that had been
21 submitted today.
22 going to say a couple of hours before the

Page 141

1      Q   Did she ever make a recommendation to
2  you that she would be the best qualified?
3      A   She did not.
4      Q   Would she have been in a position to
5  make such a determination based on her
6  position description?
7      A   If she's a personnel specialist --
8  and I don't have that background to know what
9  she does. Based on whatever criteria she
10 looks at, I would think that she would.
11     Q   Did she ever make that recommendation
12 to anybody that you're aware of?
13     A   Not to my knowledge, no.
14     Q   I want to look at the actual position
15 description that we've been talking about and
16 that is located in report of investigation at
17 tab 10. I have -- yes, 10-B. I have a copy
18 of that --
19     MR. TARAGIN: Mr. Phaup, do you have
20 an extra copy of the --
21     MR. PHAUP: I do.
22 going to say a couple of hours before the

Page 142

1  MR. TARAGIN: Could I have a look at
2  that?
3  MR. PHAUP: You may.
4  MR. PHAUP: You're welcome.
5  BY MR. TARAGIN:
6    Q  Do you see 10-A, the vacancy
7  announcement?
8    A  Okay.
9    Q  And that's for the position of a
10 computer specialist, Office of Government-
11 wide Policy Office of Information Technology.
12 Do you see that?
13   A  Yes.
14   Q  Okay. And then if you look at 10-B,
15 two pages later, that is the Peevey Library.
16 Do you see where I'm referring to?
17   A  Yes.
18   Q  And both of these documents discuss
19 the qualifications and quality ranking
20 factors for the position.
21   A  Okay.
22 MR. TARAGIN: Thank you.

Page 143

1    Q  Did you review the applications of
2  both Ms. Bradfield and -- well, strike that.
3  When you received the referral list from Ms.
4  Lewis, whose names were on the referral list?
5    A  Tokey Bradfield's, Tisha Boddie's and
6  Iona Calhoun's.
7    Q  Can you just state to me the races of
8  Ms. Boddie, Ms. Bradfield and Ms. Calhoun?
9    A  Both Ms. Calhoun and Ms. Boddie are
10 African-American, Ms. Bradfield is Korean.
11   Q  So when Ms. Lewis gave you the
12 applications -- when she gave you the packet,
13 did it contain the applications of those
14 three employees?
15   A  Yes.
16   Q  Did it contain the applications of
17 any other employees?
18   A  No.
19   Q  What I'd like to do is review the
20 quality ranking factors with you for you to
21 comment about the qualifications of both the
22 MR. TARAGIN: Thank you.

Page 144

1  complainant versus the qualifications of the
2  selectee; okay?
3    A  Okay.
4    Q  If you look on the second page in tab
5  10, on top it says qualify ranking factors.
6  The second page.
7    A  Okay.
8    Q  In the upper portion of the page,
9  it's listed one through four. Do you see
10 where I'm referring to?
11   A  Yes.
12   Q  Did you review this vacancy
13 announcement? Did that come along with the
14 application package?
15   A  Yes.
16   Q  Okay. And how long do you actually
17 determination?
18   A  I want to say at least a day.
19   Q  So you reviewed in-depth the
20 applications of all three of the people who
21 had applied?
22 review the packet when making your

Page 145

1    A  Yes.
2    Q  Going through factor number one, it
3  states that knowledge of internet and Federal
4  Information Technology policies, principles
5  and guidance. Can you state for me -- I just
6  want to focus on complainant versus selectee.
7  Ms. Boddie is -- you don't have to go through
8  what her -- where she would have been. Can
9  you comment, based on your personal knowledge
10 and review of their applications, of the
11 complainant's -- how she fit in? If she was
12 well-qualified based on statement number one.
13 Based on the knowledge of internet and
14 Federal Information Technology policies,
15 principles and guidance.
16   A  Based on my observation of Ms.
17 Calhoun and the fact that we had common
18 projects from time to time and her
19 responsibilities, I felt that she was very
20 strong in this area. For example, as I
21 mentioned, when we worked on the Information
22 review the packet when making your

37 (Pages 142 to 145)

Capital Reporting Company

Page 182

1  BY MR. PHAUP:
2  Q  Yes. Not the investigator, a
3  counselor.
4  A  I don't recall having a conversation
5  with an EEO counselor.
6  Q  Would you look at the ROI that's in
7  front of you, please? We're going to look at
8  Exhibit No. 2.
9     AFTERNOON SESSION
10  A  (Witness complies.)
11  Q  And, actually, the first page, which
12  oddly enough has the numeral two on it,
13  titled EEO Counselor's Report at the top?
14  A  Yes.
15  Q  And if you would please look at page
16  four at the bottom?
17  A  (Witness complies.)
18  Q  Actually, go back to page three to
19  start. At the bottom of page three? This is
20  the counselor's report. This is April 26,
21  2001. The EEO counselor interviewed Wanda
22  Peterson-Parker, the selecting official of

Page 183

1  record. Does that refresh your recollection
2  of whether you talked to an EEO counselor?
3  A  To be honest with you, no. But if
4  it's in here —
5  Q  Okay. Then look at page four at the
6  top for the page?
7  A  Yes.
8  Q  The last sentence at the top -- of
9     AFTERNOON SESSION
10  the first paragraph? Ms. Peterson-Parker did
11  not feel the counselee's age, race, sex or
12  prior EEO complaint activity had any bearing
13  on the selection. Does that refresh your
14  recollection whether you told that to the EEO
15  counselor?
16  A  It's here; however, to be honest with
17  you, I don't recall the conversation for
18  whatever reason.
19  heard Mr. Woodson make any disparaging racial
20  comments about African-Americans?
21  A  I have not.
22  Q  Have you ever heard him make any

Page 184

1  comments derogatory to persons who were
2  older?
3  A  Older?
4  Q  Older. Older than 40.
5  MR. TARAGIN: Objection as to
6  relevance. I don't think age is not at issue
7  in this case.
8  THE ADMINISTRATIVE JUDGE: Age is not
9  Q  Okay. Thank you. Have you ever
10  a basis in the case. Sustained.
11  MR. PHAUP: Thank you. I thought it
12  was.
13  BY MR. PHAUP:
14  Q  Have you ever heard him make
15  disparaging comments about females in the
16  work place?
17  A  I have not.
18  Q  Did you ever hear Mr. Woodson make
19  any disparaging comments about persons who
20  had filed EEO claims?
21  A  I have not.
22  Q  Have you ever heard Mr. Woodson make

Page 185

1  any disparaging comments about Iona Calhoun
2  for any reason?
3  A  I have not.
4  Q  You testified about your prior EEO
5  actions in the late 80s and early 90s. In
6  any of those prior EEO actions did you allege
7  that Mr. Woodson was a discriminating
8  official?
9  Q  Okay. Thank you. Have you ever
10  A  No.
11  Q  You testified that a manager told
12  you, you would be blackballed if you pursued
13  your action related to the transfer; is that
14  correct?
15  A  Related to the transfer?
16  Q  Wasn't your EEO action related to a
17  transfer?
18  A  Okay. You're going back to Susan
19  Robinson-Tobin? Correct.
20  Q  Yes. And so Mr. Woodson didn't have
21  anything to do with your transfer, did he?
22  A  Not to my knowledge.

47 (Pages 182 to 185)

Page 186

1  Q  And Mr. Woodson never told you, you
2  would be blackballed?
3  A  He did not.
4  Q  You testified that you have received,
5  as part of your perception that you've been
6  blackballed by GSA officials, that you had
7  received unjustified performance ratings?
8  A  Correct.
9  Q  Okay. Thank you. Have you ever
10  Q  Mr. Woodson did not give you any of
11  he?
12  A  He did not.
13  Q  And, in fact -- well, let's start --
14  for the record, since we don't have any
15  pictures or video, you're an African-
16  American; is that correct?
17  A  Correct.
18  Q  And you are female?
19  A  Correct.
20  Q  And you, as you've testified, have
21  had prior EEO activity?
22  A  Correct.

Page 187

1  Q  Has Mr. Woodson ever made any
2  disparaging comments about you?
3  A  Not to my --
4  MR. TARAGIN: Objection. Asked and
5  answered.
6  MR. PHAUP: That was about Ms.
7  Calhoun.
8  THE ADMINISTRATIVE JUDGE: Overruled.
9  those unjustified performance ratings, did
10  You may answer.
11  BY MR. PHAUP:
12  Q  Has Mr. Woodson ever made any
13  disparaging comments about you, Ms.
14  Peterson-Parker?
15  A  Not that I'm aware of.
16  Q  And, in fact, for a period of time,
17  Mr. Woodson was your supervisor, was he not?
18  A  Correct.
19  Q  And not only did he not give you bad
20  performance evaluations, he gave you good
21  performance evaluations, didn't he?
22  A  He did, yes.

Page 188

1  Q  In fact, I believe you testified in
2  your deposition that his evaluations of your
3  performance, he rated you as outstanding;
4  isn't that correct?
5  A  That's probably correct, yes.
6  Q  And, in fact, Mr. Woodson was
7  responsible for giving you performance
8  awards, was he not?
9  those unjustified performance ratings, did
10  A  During the time I reported to him,
11  yes.
12  Q  As your supervisor he gave you
13  performance awards?
14  A  Yes.
15  Q  And they included monetary awards,
16  didn't they?
17  A  Correct. Yes.
18  Q  Thank you. You testified that Mr.
19  Woodson wrote the vacancy announcement
20  without consulting you; is that correct?
21  A  Correct.
22  Q  Is it fair to say that Mr. Woodson

Page 189

1  had a better idea of what he wanted out of
2  A  I think that's fair, yes.
3  Q  I want to focus on the events -- your
4  testimony is that Mr. Woodson told you he
5  thought Tokey was more qualified; is that
6  correct?
7  A  Correct.
8  Q  And you interpreted that as Mr.
9  filling that position than you did?
10  Woodson instructing you to select Ms.
11  Bradfield?
12  A  Yes.
13  Q  Is that correct?
14  A  Yes.
15  Q  And so is it your testimony here
16  today that, in fact, Mr. Woodson made the
17  selection and not you?
18  A  Yes.
19  Q  That it reflected his judgement, not
20  yours?
21  A  Yes.
22  Q  AT the time he told you that, isn't

48 (Pages 186 to 189)

## Capital Reporting Company

Page 190

1  it true that the vacancy was still open for
2  applications; isn't that correct?
3     A   Correct.
4     Q   And at the time he told you that
5  there -- I think you said there were two days
6  left in the open period of the vacancy
7  announcement; is that correct?
8     A   I don't remember how many days were
9  remaining; however, there was time remaining.
10
11    Q   In fact, Mr. Woodson went on vacation
12 prior to closing the announcement, didn't he?
13    A   Yes.
14    Q   At the time he told you that he
15 believed Ms. Bradfield was the most
16 qualified, you did not know who the other
17 applicants were, did you?
18    A   Correct.
19    Q   You did not know whether or not Ms.
20 Calhoun had applied, did you?
21    A   Correct.
22    Q   You did not know how many applicants

Page 191

1  there were, did you?
2     A   Correct.
3     Q   And you didn't know the race of the
4  applicants, did you?
5     A   Correct.
6     Q   And you did not know the sex of the
7  applicants, did you?
8     A   Correct.
9  filling that position than you did?
10    Q   And you did not know whether any of
11 the other applicants had or had not prior EEO
12 activity; isn't that correct?
13    A   Correct.
14    Q   And it's true, is it not, that at the
15 time Mr. Woodson told you he thought Ms.
16 who the other applicants were?
17    MR. TARAGIN: Objection. Calls for
18 speculation.
19    THE ADMINISTRATIVE JUDGE: Want to
20 tell us how she knows? How she would be
21 aware?
22 BY MR. TARAGIN:

Page 192

1     Q   Do you have any reason to know --
2     MR. TARAGIN: I believe on her direct
3  testimony she said that -- the testimony was
4  elicited by Mr. Taragin that he had not seen
5  any of the other applications. And her
6  answer was, how could he because the
7  applications had not closed? I believe it's
8  already in evidence.
9  Bradfield was more qualified, he did not know
10    THE ADMINISTRATIVE JUDGE: Okay.
11 Overruled. You may answer.
12 BY MR. PHAUP:
13    Q   Mr. Woodson didn't know who the other
14 applicants were when he told you that he
15 thought Tokey was the best qualified?
16    A   Correct.
17    Q   And he did not know the race of the
18 other applicants at the time?
19    A   Correct.
20    Q   He did not know the sex of the other
21 applicants at the time?
22    A   Correct.

Page 193

1     Q   And he did not know whether or not
2  other applicants had prior EEO activity at
3  the time he told you that Tokey was the best
4  qualified; correct?
5     A   Restate that, please?
6     Q   That was a bad question. At the time
7  he told you that he thought Tokey was more
8  qualified, Mr. Woodson did not know whether
9  Bradfield was more qualified, he did not know
10 or not any of the other applicants had prior
11 EEO activity?
12    A   Correct.
13    Q   And that's why you think Mr. Woodson
14 pre-selected Ms. Bradfield, isn't it?
15    A   I think Mr. Woodson pre-selected Ms.
16 Bradfield because he generated the paperwork
17 and he told me that she was the best
18 qualified for the position.
19    Q   Prior to knowing who else applied?
20    A   Correct.
21    Q   And he did not know -- at the time he
22 told you that Ms. Bradfield was the most

49 (Pages 190 to 193)

**Capital Reporting Company**

Page 194

1 qualified, he did not know whether or not Ms.
2 Calhoun had applied?
3    A   Correct.
4    Q   And as we now know, Ms. Calhoun, in
5 fact, had not applied at the time he told you
6 that? Do you know whether or not that's
7    A   I do not know if that's true.
8    Q   Mr. Woodson was on vacation when the
9 true?
10 announcement closed; correct?
11   A   Correct.
12   Q   Thank you. I want to talk —
13 Patricia Lewis is an African-American female,
14 isn't she?
15   A   She is, yes.
16   Q   I want to talk for a second about the
17 quality ranking factors about which you have
18 testified. One through four that are in
19 Exhibit No. 10, which you testified at some
20 length about. If you want to look at them
21 again, you can. We're talking about Exhibit
22 No. 10, this is on page two.

Page 195

1    A   (Witness complies.)
2    Q   The announcement doesn't say what
3 rank is to be given to any of the four
4 factors, does it?
5    A   I don't know if they usually do.
6    Q   Okay.
7    A   I would have to read it
8 word-for-word. I don't know.
9 true?
10   Q   When you did your -- in the
11 deposition and here today —
12   A   Yes.
13   Q   -- in the deposition and here today,
14 did you assign equal rank to each of the four
15 factors? Twenty-five percent, 25 percent, 25
16 percent, 25 percent?
17   A   No. I took each ranking factors and
18 they stood alone, basically, on their own
19 merit or qualification and requirements, so
20 to speak.
21   Q   Were any of these factors more
22 important to you than any other factors?

Page 196

1    A   Again, I did not prepare the
2 paperwork for this requirement.
3    Q   Uh-huh.
4    A   What I received was the listing and
5 their resumes.
6    Q   I'm actually talking about your
7 testimony. The testimony where you gave a
8 ranking of one through 10 in the deposition
9 true?
10 and your testimony here today where you gave
11 a ranking of one through 100 for each of the
12 factors. I'm talking about your testimony.
13 When you did that ranking in your mind and
14 you concluded that Ms. Calhoun was more
15 qualified than Ms. Bradfield, did you assign
16 equal weight to your scores on each of the
17 four factors? In other words, is factor one
18 just as important as factor four?
19   A   When I was given the rank of zero to
20 100, that was based on the qualifications of
21   Q   Correct. And you went through the
22 four facts and then you concluded that Ms.

Page 197

1 Calhoun was more qualified than Ms.
2 Bradfield. And I'm asking you now, when you
3 reach that ultimate conclusion, do you give
4 equal weight to each of the four factors? Is
5 factor four as important as one? Two just as
6 important as three? Are they all equally
7 weighted in your mind when you did your
8 analysis?
9 the applicants.
10   A   Personally, I would not say they were
11 all equal.
12   Q   Okay. Which ones are more important?
13   A   I would say number one is important,
14 number four is important, number three is
15 important and number two is important in that
16 order.
17   Q   Okay. Do you know whether Mr.
18 Woodson shared your ranking of the importance
19 of the factors?
20   A   Do I know what now?
21   Q   Do you know whether or not Mr.
22 Woodson shared the ranking of the importance

50 (Pages 194 to 197)

**Capital Reporting Company**

Page 214

1   Q   Do you recall Mr. Phaup asking you a
2   question regarding your perceptions of the
3   selection due to your prior EEO history?
4   A   Yes.
5   Q   Sitting here today, so it's clear for
6   the record, did your prior EEO activity have
7   any affect on any testimony you gave today or
8   on your decision to give any of the testimony
9   the applicants to the position?
10  you gave today?
11  A   My previous or prior EEO background
12  led me to make the decision as I was directed
13  to by Paul Woodson.
14  Q   Is your opinion about GSA management
15  -- did that color your decision -- or was it
16  colored by -- strike that. Was you opinion
17  of GSA management colored by your prior EEO
18  history?
19  A   Based on where I was located at that
20  time and the senior management within that
21  organization at that time, it would have been
22  colored by my EEO history because the same

Page 215

1   senior managers were there in the
2   organization.
3   Q   Were you able to be objective despite
4   that?
5   MR. PHAUP:   Objection to the
6   that she was objective about.
7   THE ADMINISTRATIVE JUDGE:   Sustained.
8   BY MR. TARAGIN:
9   vagueness. It's not clear what he's asking
10  Q   Were you able to be objective during
11  the selection process despite that?
12  A   Well, when I made the selection,
13  objectivity had nothing to do with it really.
14  I did what I was told.
15  Q   Is your testimony today affected by
16  any of your -- colored by any of your prior
17  EEO history?
18  A   No.
19  Q   In 2000, do you believe that there is
20  an environment of discrimination within the
21  agency?
22  A   Off the top of my head I would say

Page 216

1   yes.
2   Q   What's that based on?
3   A   These things are intangible, not
4   necessarily things you can see and feel. And
5   I cannot give you -- going back to the year
6   2000, personally I was fine because I
7   reported to a very fair person. But it's my
8   understanding that, that wasn't the case
9   vagueness. It's not clear what he's asking
10  throughout the organization. And I cannot
11  pinpoint any personal situations.
12  MR. TARAGIN:   I have nothing further.
13  THE ADMINISTRATIVE JUDGE:   Mr. Phaup,
14  any new issues raised on redirect?
15  MR. PHAUP:   Very quickly.
16  RE-CROSS-EXAMINATION
17  BY MR. PHAUP:
18  Q   Testimony about how a selecting
19  official could have obtained knowledge who
20  applied, is there anything to prevent an
21  applicant from simply telling Mr. Woodson
22  that they applied?

Page 217

1   A   Not to my knowledge.
2   Q   You testified that going back to the
3   year 2000, you reported to a very fair
4   person. That very fair person was Mr.
5   Woodson, wasn't it?
6   A   No. I meant Cynthia Warner. May I?
7   Q   I'd rather you didn't. Okay.
8   Finally, about the vacancy announcement and
9   vagueness. It's not clear what he's asking
10  who could apply?
11  A   Yes.
12  Q   It was open to all GSA employees who
13  otherwise met the criteria; isn't that
14  correct?
15  A   I don't know. I would have to look
16  at the vacancy --
17  Q   Let's look at the vacancy
18  announcement. Exhibit No. 10. Where it says
19  area of consideration at the very top.
20  Q   See eligibles in the local committee
21  area, status employees of the GSA in the
22  Washington, D.C. commuting area?

55 (Pages 214 to 217)

(866) 448 - DEPO
www.CapitalReportingCompany.com

## Capital Reporting Company

Page 218

1  A  Correct.
2  Q  So it was not limited to Mr.
3  Woodson's division and your division, was it?
4  A  Correct.
5  MR. PHAUP: Okay. That's all.
6  THE ADMINISTRATIVE JUDGE: All right.
7  It appears that you've concluded your
8  testimony now. I'd like to thank you very
9  A  Consideration -- yes.
10  much for coming and testifying. I'm ordering
11  you not to speak to anyone; including the
12  complainant, about these questions or any
13  aspect of the complaint. Again, if the
14  order's not followed, a sanction may be
15  imposed, which may include a judgement
16  entered in favor of one part or the other.
17  Do you understand the seriousness of that
18  order?
19  THE WITNESS: Yes.
20  THE ADMINISTRATIVE JUDGE: Thank you
21  very much.
22  THE WITNESS: Is this going to be it?

Page 219

1  THE ADMINISTRATIVE JUDGE: Yes.
2  THE WITNESS: Meaning no one will
3  call me --
4  THE ADMINISTRATIVE JUDGE: Let's go
5  off the record.
6  (Off the record.)
7  THE ADMINISTRATIVE JUDGE: We've
8  completed the testimony of Ms.
9  A  Consideration -- yes.
10  Peterson-Parker. We still have the matter of
11  the pending motion in limine. While off
12  record Mr. Phaup indicated that he was not
13  going to call Ms. Bradfield to testify, which
14  would tend to make the motion mute at this
15  point. Are there any other matters that need
16  to be addressed on record before -- well, let
17  me go back a step. Mr. Phaup, does the
18  agency rest its case?
19  MR. PHAUP: Yes, your Honor.
20  THE ADMINISTRATIVE JUDGE: Then are
21  there any other matters pertaining to either
22  the hearing, or pending issues pre-hearing,

Page 220

1  that either of you feel need to be addressed
2  before we move into the closing? Let's start
3  with Mr. Taragin.
4  MR. TARAGIN: May I speak for a
5  moment, your Honor.
6  THE ADMINISTRATIVE JUDGE: Off
7  record?
8  MR. TARAGIN: No.
9  A  Consideration -- yes.
10  THE ADMINISTRATIVE JUDGE: Certainly.
11  MR. SNIDER: Very briefly. The
12  I'm sorry. Seven and eight and the statement
13  of page nine, unlike the affidavits of Wanda
14  Peterson-Parker at tab six and the plaintiff
15  at tab five, are not initialed or signed on
16  the first pages and each of them has a
17  certification on the last page that, quote, I
18  have signed or initialed each page. So we
19  ask that they be stricken in their entirety
20  because they are not certified as the person
21  signed on the last page of each of these
22  documents. I have read the statement, it is

Page 221

1  true and correct. I have signed or initialed
2  each page. I've been given an opportunity to
3  make any corrections or additions which have
4  been initialed. Not tab seven, not tab
5  eight, and certainly not the memo to file,
6  which is followed up by a similar statement
7  at tab nine. None of them have signatures or
8  initialing on the first pages. We ask that
9  affidavits at ROI tabs seven, eight, nine --
10  these be stricken from the ROI.
11  THE ADMINISTRATIVE JUDGE: Is there
12  any -- do you have any reason to believe that
13  the affidavits are not accurate?
14  MR. SNIDER: Yes. The person signs
15  under the penalties of perjury that they have
16  signed or initialed each prior page and these
17  pages are not signed and initialed.
18  THE ADMINISTRATIVE JUDGE: I
19  understand that, very clearly. But this is
20  an ROI. As was pointed out at the beginning
21  of the hearing this morning, this is a very
22  old case, so there's been a lot of time to