IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x
                                 :
IONA D. CALHOUN,                 :
                                 :
         Plaintiff,              :
                                 :
    v.                           :  Civil Action No.
                                 :  06-1441 (HHK)
LURITA A. DOAN, ADMINISTRATOR,   :
GENERAL SERVICES ADMINISTRATION, :
                                 :
         Defendant.              :
                                 :
- - - - - - - - - - - - - - - - x

                    Washington, D.C.
                    Thursday, April 10, 2008

Deposition of

              IONA D. CALHOUN

a witness of lawful age, taken on behalf of the

Defendant in the above-entitled action, before Debra S.

Derr, Notary Public in and for the District of

Columbia, in the offices of 501 Third Street, N.W., 4th

Floor, Washington, D.C., 20530, commencing at 10:28

a.m.

GOVERNMENT EXHIBIT 3

1    Q    Okay. So he was the selecting official. He was
2 not your supervisor at a time?
3    A    Not at that time, no.
4    Q    Mr. Kellett was?
5    A    Right.
6    Q    And was Mr. Whitson in the same division as you?
7    A    No. No, I don't think he was the same division.
8    Q    You say that you -- he was your supervisor at one
9 time. When was that, if you remember?
10   A    I know it was a couple of years prior to that, but
11 I don't remember exactly.
12   Q    Were you in a different job when you were being
13 supervised by Mr. Whitson?
14   A    At a time, I'm trying to think. When I was
15 supervised by Mr. Whitson, I believe I was a full-time union
16 official, I think.
17   Q    I see. How does that work? You can be supervised
18 by a regular GSA official and then be a full-time union
19 official?
20   A    Well, you have to report to someone who is a
21 regular government employee --
22   Q    I see.
23   A    -- who's your supervisor in the unit that you work
24 in. So at that time --
25   Q    But you actually don't work in that unit?

1  training, October 7th; denial of BOMA conference,

2  October 20th -- and both of these are year 2003; and the

3  other one is nonselection for promotion. Do you want the

4  number of the promotion, the vacancy number?

5       Q    Yes. Yes.

6       A    03008903MP.

7       Q    Okay. And would you look at tab 5 and tab 6 -- I

8  think they start at page 92, 92 to 98 -- and tell me what

9  those documents are?

10      A    These are a list of the employees in the office of

11 real property.

12      Q    Well, there you are. There's your list of

13 employees.

14           Does that refresh your memory?

15      A    Dennis Goldstein.

16      Q    What grade was he?

17      A    A 14.

18      Q    Why don't you give me the individuals and their

19 grades.

20      A    Okay. Stanley Langfeld, GS-15. Dennis Goldstein,

21 GS-14. Robert Harding, GS-14. Gary Jordon, GS-14. Michael

22 Mulloy, GS-14. McDonald Peoples, GS-14. Now, McDonald

23 Peoples was a 13 when I went to the office.

24      Q    So during -- but during this period, he was a 14?

25      A    During the period of this particular thing. But

1  when I went to the office, he was a 13.  Kenneth Holstrom,

2  GS-14.  Sheldon Greenberg, GS-14.  Iona Calhoun, GS-13.

3      Q    So if we could, if you wouldn't mind, I tried to

4  write it down, and you have it in front of you.  What were

5  their either titles or their -- do they give the GS series

6  rating, the series?

7      A    Yes.  GS-1170.

8      Q    1170 for Holstein?

9      A    Let's see here.  Mr. Holstein, he was a GS-301.

10     Q    301?

11     A    Dash 14.

12     Q    And what was his title?

13     A    Program expert.

14     Q    And Mr. Goldstein?

15     A    Everyone else was an 1170 except for Sheldon

16  Greenberg.  He was an 1176.

17     Q    And what was his title?

18     A    Lead building management specialist.

19     Q    So Dennis Goldstein was a 14 1170 and Stanley

20  Langfeld was an 1170, GS-15?

21     A    That's what it says.

22     Q    That's what it says?

23     A    Uh-huh.

24     Q    Michael Mulloy was a GS-14 1170?

25     A    Yes.

1   Q   McDonald Peoples was a GS-14 1170?

2   A   Yes.

3   Q   John Thomas was a 14 1170?

4   A   Yes.

5   Q   Now, I've put down Michelle. You started to say

6   Michelle, but I --

7   A   Sheldon Greenberg.

8   Q   Oh, that was Sheldon. I'm sorry.

9   A   Yeah. They're all males.

10  Q   Carol Minor?

11  A   She's not listed here.

12  Q   Iona Calhoun?

13  A   Yeah. I don't know what's the date on this.

14  Q   And what is the series?

15  A   The series that they put me in, management and

16  program analyst series, 343.

17  Q   So that was a 343. Carol Anandale? GS-14, and

18  what series?

19  A   They don't have her listed here. I think Carol

20  Anandale was called a program expert, but I don't know. I

21  don't think she was a realty specialist.

22  Q   But it's your understanding she was a GS-14?

23  A   She was a 14.

24  Q   Robert Harding? He was a GS-14 --

25  A   Right.

1   Q   -- 1170?

2   A   Right.

3   Q   Or something else?

4   A   No. No. Everyone was 1170 -- even Stanley was an

5   1170 -- except for Sheldon Greenberg. He was an 1176.

6   Q   I'm sorry. You just said you were a 343.

7   A   Yeah. I am 343. I'm talking about all the other

8   folks.

9   Q   Everybody else except for?

10  A   Except for me.

11  Q   Were 1170s?

12  A   Right.

13  Q   And Carol's not there.

14  A   She's not --

15  Q   You mentioned somebody named Jerry Johnson or

16  Jordan or something? I jotted down another name here.

17  A   Well, I can read you the names again. I don't

18  have -- I have Stanley Langfeld, Dennis Goldstein, Robert

19  Harding, Gary Jordon. And he was also 1170-14.

20  Q   Okay. All right. So that was the office during

21  this period of your claims of not being able to go to

22  training. And then there was the --

23  A   And Carol Anandale. I don't know why she's not

24  here.

25  Q   She's not on there? Okay.

Page 55

1   A   I don't know why she's not on.

2   Q   All right. If you wouldn't mind letting me take a
3   look at that, I want to again just get these claims down
4   correctly. Tab 5, I thought it was at tab 5.

5       (Pause)

6       BY MS. WHITAKER:

7   Q   I think that because you made claims over a period
8   of time in this particular report of investigation, it might
9   be easier for us to just look at the summary that the EEO
10  counselor provides. And I just want to ask you about each
11  one of them.

12      This first one is the October 7, 2003 request for
13  uniform standards of professional appraisal practice. That
14  was denied. And how do you believe that was discriminatory?

15  A   Because it was something that would enhance my
16  background in real property.

17  Q   There's something in the record that indicates that
18  you may not have passed some appraisal courses?

19  A   Yes. There was one I did not pass.

20  Q   And when was that?

21  A   Right after the first one because this one had to
22  do with a lot of mathematical problems on figuring the areas
23  of government buildings and how you -- I don't really
24  remember all of it because it was very complicated. But --

25  Q   So you took the first one, which was an

1   introductory appraisal course?

2   A   Right.

3   Q   And then you took a more advanced one?

4   A   Right.

5   Q   And the one that is listed here, uniform standards

6   of professional appraisal practice, from what I saw in the

7   record, Mr. Langfeld felt that that course was more designed

8   for people who had businesses, and that's why he denied it.

9   A   That's what he told me.

10   Q   Do you have any doubt that that's true?

11   A   Well, I felt like this. If you take three courses,

12   if I were to take all three of them, I'd get a certification

13   for appraisals. And I felt like he didn't want me to have a

14   certification, so that's why it was really denied. Because

15   the lady in charge of the program, she had said most people

16   who worked for government would get it to show they were

17   proficient in that area. And I gave him the information from

18   her and what she said that, but he still denied it.

19   Q   Well, he suggested that you take the appraisal

20   procedure training.

21       Did you take that?

22   A   I think -- I don't know which one it is, but that

23   might have been the second one because the uniform would have

24   been the third one in a series.

25   Q   I see. So the uniform one was the one after the

1  course that you did not pass?

2      A    Right.  I believe, if I'm --

3      Q    Did you ever repeat that course?

4      A    (No audible response.)

5      Q    You have to respond orally.

6      A    No.

7      Q    The second training course is the BOMA, October 20,

8  2003.  BOMA, what does that stand for?

9      A    Building Owners Management Association, I think.

10 Now, I don't really remember because they always used the

11 acronym.

12     Q    And you claimed that he denied you the opportunity

13 to go to that?

14     A    Yes, he did.

15     Q    And you base that on discrimination?

16     A    I do.

17     Q    What was the reason that he gave you, if you

18 remember?

19     A    I think -- I'm not sure if I remember, but I think

20 he might have said only certain people in the office was

21 appointed to go.

22     Q    But here it says that the training was limited to

23 two employees per conference.

24     A    Well, they also told me the training was limited to

25 two employees who had never gone to a particular conference

Page 87

1   BY MS. WHITAKER:

2   Q   This is Burmeister?

3   A   Yes. And Mr. Burmeister was 91.49.

4   Q   Other than that scoring -- and is that done by

5   personnel?

6   A   Uh-huh. Based on the information you give when you

7   apply for a job.

8   MR. FUCHS: You have to answer yes or no.

9   THE WITNESS: Yes.

10   BY MS. WHITAKER:

11   Q   And other than that, what else makes you more

12   qualified than him?

13   A   I was in the division doing the work.

14   Q   And what's the date of this application? 2004?

15   A   Yes. It's created 3/10/04.

16   Q   So does that mean that that was -- you had three

17   years of experience?

18   A   In that division, yes.

19   Q   And do you know what Mr. Burmeister's experience in

20   real estate was?

21   A   No. It should be somewhere in here, but I don't

22   know.

23   Q   So you don't know what his experience is. Do you

24   know anything about his background?

25   A   No. I believe the application might be in here, if

Page 92

1       MR. FUCHS: Objection.

2       THE WITNESS: I don't know.

3       BY MS. WHITAKER:

4   Q   You don't know? Okay. But she was already a 14,
5 and she got a 99.77.

6       Why do you believe you were more qualified than
7 Ms. McDonald?

8   A   Because for the same reason. I was already doing
9 the work. She was also from PBS.

10  Q   She was also from this public building services?

11  A   Right.

12  Q   And do you know how many years she'd been working
13 in real estate?

14  A   Huh-uh. No, I don't.

15  Q   Do you know what her background is?

16  A   No, I don't.

17  Q   Do you know what her education was?

18  A   No.

19  Q   Her previous experience?

20  A   No.

21  Q   But you just believe that you were better?

22      MR. FUCHS: That mischaracterizes the testimony.

23      BY MS. WHITAKER:

24  Q   You can explain.

25  A   I was going to say, if you'd like, I can take the

1   Q   And when you -- I'm sorry.

2   A   So I would say a couple times a week.

3   Q   Two times a week or three times a week?

4   A   What are the -- for the --

5   Q   You said -- how often would you --

6   A   Well, I would try to do a little bit every day --

7   Q   Of union --

8   A   -- about an hour or an hour or two.

9   Q   Okay. And when you went down there two times a
10  week, how long did you stay?

11  A   It depends on what the problem was. If I was
12  meeting an employee and they had a problem, I might be gone a
13  couple of hours. If it was just to answer the phone, I might
14  just take my lunchtime and just go down there.

15  Q   Were you ever late for meetings in real property?

16  A   I was I ever late?

17  Q   Uh-huh.

18  A   Probably, if I was meeting with an employee, yes.

19  Q   And was that a problem for your team?

20  A   I don't think it would have been a problem for my
21  team because if I was late, I'd let them know. And there
22  might have been one or two times I might not have gotten an
23  opportunity to let them know, but I wouldn't say it was a
24  problem.

25  Q   Were there --

1   Q   Did you ever have critical comments on the FIRM
2   report -- reports?
3   A   When you say critical comments --
4   Q   Yeah. Somebody says it's not right, what you've
5   done.
6   A   Oh, is that what you mean? Yes. Yes.
7   Q   Was that frequent or --
8   A   I remember at least two occasions that Stanley gave
9   me, after the fact, where he and Ms. Anandale said it was
10  incorrect. But they didn't tell me what was incorrect that I
11  did.
12  Q   I see.
13  A   And I think there are at least two in the reports
14  of investigation which I did address as to why they were not
15  incorrect with the work I was given and the information I was
16  given.
17  Q   All right. If we could turn to the performance
18  evaluation in 302X. That is the one that is mentioned in
19  your amended complaint, paragraph 8, as corrected. As
20  corrected.
21  A   Okay. Which one? You said 302.
22  Q   All right. You refused to sign this evaluation.
23  Is that correct?
24  A   No. I signed it.
25  Q   All right. What is the overall evaluation?

1  same level which you were, or not?

2    A   Say that again?

3    Q   Did you apply for the position that you -- when you
4  entered the GSA workforce? Did you apply and were accepted
5  for that position?

6    A   The one I was working in? No.

7    Q   So OMB took the position and gave it to GSA.
8  Correct?

9    A   Well, that's my understanding.

10   Q   So the whole position was transferred?

11   A   As far as I know.

12   Q   And at OMB, you were working in IT?

13   A   I was a management analyst at OMB in the budget
14 review division, and I was working in committee meeting
15 secretariat. So I was doing dual jobs. So when I
16 transferred over to GSA, I was just in committee management
17 secretariat.

18   Q   Did you change series when you went to GSA?

19   A   No. The series wasn't changed, just the name of
20 the job.

21   Q   What series were you in at OMB?

22   A   I think it was 301.

23   Q   And when you were at GSA, you were a 343. That's
24 what you testified to earlier.

25   A   A computer specialist 343, yes.

1  MR. FUCHS: I mean the portion of the ROI based

2  upon which you make that representation.

3  MS. WHITAKER: Actually, I'm representing it in

4  414X, not 88. 414X, that is the one that's the Burmeister/

5  McDonald one, I believe. I'm sorry, I'm a little confused

6  because there are different things in different places. But

7  as long as the accepted claims match up -- sorry.

8  THE WITNESS: Well, like I said, the leadership,

9  that's a claim itself. So that needs to be put in there.

10  MR. FUCHS: Well, could I see the accepted issue

11  that refers only to reprisal?

12  MS. WHITAKER: Yes. But I think we should take a

13  break because I'm not exactly sure which one it is right now.

14  I said 88, then I said 414, and I want to check it.

15  MR. FUCHS: Okay. I mean, we could go on, too.

16  BY MS. WHITAKER:

17  Q  Did you take training courses while you were in

18  real property?

19  A  Yeah, I did.

20  Q  And would you say you averaged two a year?

21  MR. FUCHS: Objection.

22  BY MS. WHITAKER:

23  Q  Or more?

24  MR. FUCHS: You may answer. Sorry.

25  THE WITNESS: One year I might have averaged more

Page 123

1  than two. One of the years, I believe.

2        BY MS. WHITAKER:

3    Q   But you had at least two a year?

4    A   I have to check. I know one of the years there was

5  a while there I might not have averaged two a year. So I

6  have to check.

7    Q   And you're going to also check to see how much time

8  you spent in union business when you were in real property?

9  Or do you know now? You said two or three days, but

10 percentage-wise?

11   A   Well, percentage-wise, I gave my tally sheets to

12 Mr. Langfeld each week. So it probably would be easier to

13 get them from him because he definitely got them from me

14 every week or however. Because I had to give him everything,

15 and he made sure he got my tally sheets. So that would be

16 the best introduction, is to just get it from Mr. Langfeld,

17 because he got them. I wouldn't say that I would have them

18 all, but I'm sure he does.

19   Q   You make an allegation about equal pay. What is

20 that allegation all about?

21   A   Equal pay is not getting paid what men get paid.

22 And I never have the whole time I was in GSA. And it's also

23 about GSA, when I was in the career ladder, delaying my

24 promotion for 11 months. And then they wouldn't promote me

25 to the jobs that I was doing for the 13, 14, and 15. So I've

Page 127

1  Q   Well, the training issue is in 302 and is in 88,
2  just the two years, 2002 and 2003.  If you'd like, we can
3  take the time and look at those to see if it covers that
4  period.  In fact, maybe we should take a break to do that.
5  But before we do --
6  A   I know.  But if it's -- you're only talking about
7  two years.  I'm talking about all the years I was up there,
8  what people were taking.
9  Q   I'm just looking at the claims you make.  I'm only
10 focusing on where you say you took courses, or wanted courses
11 and didn't get them.  You say you can't remember who it was
12 that's similarly situated, but you make the representation
13 here that there were people that were similarly situated.
14 A   All of my team.
15 Q   You wouldn't have made this representation if you
16 didn't know anybody, if you didn't know.
17 A   I know my teammates.
18 Q   Okay.  Who were they?
19 A   I named them already.  Everyone except Stanley
20 Langfeld I consider my teammates.  Since I was the only 13
21 there --
22 Q   So you're suggesting that your teammates all got
23 the training that you were denied?
24 A   No.  I didn't say that.  I said they got the --
25 they probably got the training they wanted.  I don't know

Page 128

1  what they were denied. I know I was denied. I don't think
2  they were denied. If they requested training, I believe they
3  got the training.
4      Q   Well, you go on to say, in very specific terms,
5  "Plaintiff also was denied leave in March 2002, unlike
6  similarly situated coworkers."
7          Who are those people that were given leave and you
8  were denied leave? I mean, you make reference to somebody.
9  You must have had somebody in mind.
10     A   I think I answered that in the report of
11 investigation. I don't remember right now the names. But I
12 probably might have been referring to Anandale or maybe
13 Peoples. But I believe it's in the report of investigation,
14 so I don't want --
15     Q   Which report? Which claim?
16     A   Miss, I wouldn't know which claim after a hundred
17 pages and don't have anything in front of me.
18     Q   I'm sorry. I'm looking at your complaint. I've
19 got to deal with what you say. If you don't know, how do you
20 expect me to know?
21     A   Well, I didn't know or I would have brought my
22 things there, my information. But it should be in the report
23 of investigation.
24     Q   Okay. Then in 20, you say, "Plaintiff received a
25 negative performance evaluation from Langfeld, who never

1    A    Yes.

2    Q    And you said you couldn't really say with certainty
3  whether you had trained two times a year.

4         Was it uncommon for you to train two or three times
5  a year?  To the best of your recollection?

6    A    I do recall one time Stanley was going to take an
7  OPM class, and he talked to me about going in his place.  So
8  I might have taken that class and two others.  But other than
9  that, I do not recall if there was more than one year of
10 taking more than two classes.

11   Q    But how about just taking two classes?  Was that
12 fairly common or uncommon?

13   A    Well, see, we're talking about different things.
14 Usually a conference or training that had to be paid for, I
15 was told that you could only take two.  Since I don't know
16 what the others were allowed to take, I find that hard to
17 answer.  But I do not believe -- I think based on some of our
18 reports of investigation that some people had numerous
19 training that had to be paid for within a year.

20   Q    How do you know that?

21   A    Because it's in some of these reports.

22   Q    Did you ever hear it from any of these people
23 themselves?

24   A    Oh, no.  No, because it wasn't usually the black
25 employees.  So no.